**In the Matter of READING COMPANY, Debtor.**

No. 71–828.

United States District Court, E. D. Pennsylvania.

Dec. 15, 1978.

Howard H. Lewis and James A. Sox, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for trustees of Reading.

David Berger, Berger & Montague, Philadelphia, Pa., for certain Reading bondholders.

Douglas G. Sanborn, Deputy Atty. Gen., State of N. J., Trenton, N. J., for the State of N. J.

OPINION

RELATING TO ORDER NO. 1519

DITTER, District Judge.

The trustees of the bankrupt Reading Company (Reading) petitioned for approval of a real estate tax settlement with one of its largest creditors. The issues before me were whether this settlement was in the best interest of the bankrupt and whether it would create unlawful consequences or undesirable precedents for other taxing authorities. This opinion will explain why I gave my approval.

Although Reading is currently paying real estate taxes, it owes $6,500,000 [1] to the City and School District of Philadelphia (Philadelphia). Reading has some funds which can be applied toward its tax liabilities. The most important asset in this category has been realized from the sale of Reading properties and is held in an account established by Order No. 200 maintained with debtor's mortgage trustee, Manufacturers Hanover Trust Company. More importantly, Reading expects to receive a considerable amount of money from the valuation case presently in litigation before the Special Court for properties conveyed to ConRail.[2] Reading has negotiated an agreement with Philadelphia utilizing the anticipated assets of the valuation case as well as monies from the account established by Order No. 200 in exchange for the satisfaction of this significant tax debt.

The main features of the settlement are the cash payment of 30 percent of the taxes which Reading and its subsidiaries owe Philadelphia for the years 1971 through 1977, the possible payment of the remaining 70 percent of the tax claim from the proceeds of the valuation case,[3] interest on this deferred balance to accrue at the rate of eight percent compounded annually, the waiver of Philadelphia's right to vote or participate in the plan of reorganization, and protection for Philadelphia in the event that the Reading makes a more favorable arrangement with some other taxing authority.

Certain objections to this settlement have been raised. The holders of Reading series "D" First Mortgage Bonds contend that the trustees of Reading present little data from which the court can conclude that the settlement is fair and equitable. I do not agree. It is apparent from the face of the agreement that by virtue of this settlement, for the time being Reading will be relieved of the impact of a $6,500,000 debt by the present payment of approximately $2,000,000.

This 30 percent cash payment will be accepted by Philadelphia as full satisfaction

1. This amount includes all real estate taxes owed to the City and School District of Philadelphia, together with statutory interest for the years 1971 through 1977, by the Reading and its subsidiaries and former lessors, the North Pennsylvania Railroad Company, and the Philadelphia, Germantown & Norristown Railroad Company whose real estate taxes Reading is obliged to pay under an agreement dated April 1, 1976.

2. Pursuant to a Congressionally approved Final System Plan, Reading conveyed as of March 31, 1976, most of its operating assets to Con-Rail in exchange for common and preferred stock of ConRail and certificates of value guaranteed by the United States in an amount equal to the net liquidation value of the Reading's property. In the valuation suit before the Special Court, Reading contests the adequacy of this compensation.

3. If Reading receives money from the valuation case in the Special Court in an amount in excess of the net liquidation value assigned to it by the Final System Plan as supplemented and the interest accruing on that amount, the City and School District will share ratably in the distribution of these funds with other taxing authorities. "The foregoing means that the City and School District shall be given consideration in the same percentage of their claims as all taxing authorities which do not accept this offer, but that the City and School District's compensation shall be paid out of, or based on, the Additional Compensation only; provided, however, that the City and School District shall have a first lien on such Additional Compensation subject only to the claim of lien of the United States Railway Association and Consolidated Rail Corporation pursuant to Section 211(h) of the Regional Rail Reorganization Act of 1973, as amended, and other liens if any of an administrative priority superior to real estate taxing authorities." Agreement ¶ 1(c).

of the Reading's debt if Reading is unsuccessful in obtaining compensation in excess of that allocated to Reading in the Final System Plan. The same arrangement will be offered to other taxing bodies, and to the extent they accept, tax liens on the retained property of Reading will be discharged. Assets will be freed for use in the reorganization attempt to satisfy other creditors since those taxing authorities accepting the agreement will have to look solely to the additional compensation in the valuation case. Furthermore, the taxing authorities' waiver to vote in a plan of reorganization will simplify its approval.

The bondholders raise the additional criticism that interest on the deferred tax claim is excessive in that eight percent interest compounded annually instead of the legal six percent interest rate will cost the estate thousand of dollars if applied to all agreements with the estate. The realities of today's money market plus the fact that Judge Fullam in the Penn Central case allowed the identical rate of interest on C–1 notes convinces me that an eight percent interest rate compounded annually is fair and equitable as to taxing authorities in this reorganization. *In the Matter of Penn Central Transportation Co.*, 458 F.Supp. 1279–80 (E.D.Pa.1978). Furthermore, eight percent compounded annually is the interest rate which Reading will be paid on any additional compensation it receives in the valuation case. Regional Rail Reorganization Act § 306(c)(4)(D), as amended, 45 U.S.C. § 746(c)(4)(D) (1976).

The State of New Jersey is concerned that the settlement agreement might constitute a waiver by any accepting taxing authority of its claims against ConRail for the balance of taxes due in 1976. Under the Final System Plan, Reading's operating assets were conveyed to ConRail as of March 31, 1976. This split the tax year so that Reading owned the property for three months and ConRail owned it for nine. The Special Court in Section 4(a) of its Order of March 2, 1976, (Sp.Ct.Rptr. M–000073–M000076), held that ConRail has the obligation with respect to those nine months. The settlement agreement deals only with claims admittedly due by Reading to Philadelphia. Reading does not admit that it has any obligation to any taxing authority or to ConRail for the nine months in 1976 following April 1, 1976. Thus, the settlement agreement and this court's order have no effect on any taxing authority's right to assert a claim against ConRail or the trustees for any taxes based on the last nine months of 1976. The taxing authorities are free to assert such claims, and the trustees are free to deny any obligation with respect to them.

The State of New Jersey expresses concern that nontax claimants (other than the government's 211(h) claims) may assert priority over the claims of taxing authorities which have compromised their real estate taxes. New Jersey seeks to have this settlement agreement establish a priority structure in favor of taxing authorities accepting the settlement. This cannot be done. The settlement agreement does not attempt to establish priorities among the creditors of the estate. The agreement simply limits Philadelphia's rights with respect to the balance of its claim, plus interest, to the additional compensation defined in the agreement, so that the city will share the additional compensation ratably with other taxing authorities and those of like priorities. It would be inappropriate at this time to give accepting taxing authorities a higher priority; these matters are best left to hearings on the Plan of Reorganization.

In summary, the agreement is intended to deal with real estate tax claims asserted by Philadelphia and admitted to be due by Reading for the years 1971 to 1977. According to the fair and equitable requirement of Section 77(e)(1) of the Bankruptcy Act the same offer must be made to all taxing authorities to which Reading owes real estate taxes. However, the trustees have the right to challenge tax claims other than real estate or claims made against Reading for the period after April 1, 1976, as to properties conveyed to ConRail. The financial impact of this settlement on the bankrupt will depend on the extent to which it obtains additional compensation

from the valuation case. However, at this time, the overall effect of the settlement is fair, equitable and in the Reading's best interests. Consequently, I approved the trustees' petition.