**In the Matter of READING COMPANY, Debtor.**

**Bankruptcy No. 71–828.**

United States District Court,
E.D. Pennsylvania.

May 21, 1980.

See also, D.C., 551 F.Supp. 1205.

Howard H. Lewis, James A. Sox, John J. Ehlinger, Jr., Philadelphia, Pa., for trustees.

John H. Broadley, U.S. Dept. of Justice, Washington, D.C., John J. Degnan, Atty. Gen., Douglas G. Sanborn, Deputy Atty. Gen., State of N.J., Trenton, N.J., Prince Altee Thomas, Asst. Atty. Gen., Com. Pa., Philadelphia, Pa., Robert W. Blanchette, Clifford W. Losh, Washington, D.C., G. Clarke Cummings, New York City, Edward C. Toole, Jr., Robert L. Pratter, James E. Howard, Philadelphia, Pa., Lawrence Z. Shiekman, Pepper, Hamilton & Scheetz, Brian S. North, Consolidated Rail Corporation, Philadelphia, Pa., Harry G. Silleck, Jr., New York City, David Berger, Daniel Berger, Philadelphia, Pa., for defendants.

## OPINION RE APPROVAL OF THE PLAN OF REORGANIZATION

DITTER, District Judge.

### HISTORY OF THE READING RAILROAD REORGANIZATION

Once the largest corporation in the world, the power and financial base of the Reading Company has eroded steadily since the demand for rail as a form of passenger and freight transportation diminished. Reading's income fell short of its expenses and finally, on November 23, 1971, it filed for reorganization under section 77 of the

Bankruptcy Act, 11 U.S.C. § 205, thus becoming a part of the nation's rail crisis which eventually found seven other major railroads in the northeast and midwest seeking reorganization.

At the time of bankruptcy, Reading had a yearly operating income loss of $5.7 million and a net ordinary loss of $11.5 million. Order No. 1 stayed the payment of taxes, rents to leased lines, and proceedings by creditors against the railroad for suits stemming from the operation of trains. In 1972, the net operating loss increased to $12.1 million and the net ordinary loss to $20 million. In 1973, the situation slightly improved in that the net operating loss totaled $8.7 million and the net ordinary loss was $12.7 million. These gloomy financial statistics for Reading as well as the other bankrupt northeast and midwest railroads, coupled with the great public need for continuing rail service and the enormous inherent value of the railroads, provoked Congressional action to preserve an operating rail system.[1]

Intervention came by way of the Regional Rail Reorganization Act of 1973 (RRRA), 45 U.S.C. §§ 701–94. Essentially, the RRRA set up a plan for conveying the operating assets of the bankrupt railroads to a new corporation created by the Act, the Consolidated Rail Corporation (ConRail), 45 U.S.C. § 741–47. Pursuant to the RRRA the bankrupt railroads would continue to operate under their respective reorganization courts for twenty months. During that time, the newly formed United States Railway Association (USRA), see 45 U.S.C. § 711, was to plan which parts of the rail system were to be conveyed to ConRail. The bankrupt railroads were to receive ConRail securities[2] in exchange for the conveyance of their operating rail assets. A three-

judge "Special Court" was created to rule on the valuation of the conveyed property. See 45 U.S.C. §§ 719 and 743.

Before the Reading would be subject to the RRRA, I had to find that it was not reorganizable under section 77, or, if it was, that the public interest would be better served by reorganization under the RRRA rather than under section 77. See 45 U.S.C. § 717(b). I concluded that the Reading Company was not reorganizable on an income basis within a reasonable time under section 77 and thus, was eligible to be reorganized under the RRRA. *In re Reading Company,* 378 F.Supp. 474 (E.D.Pa.1974). As required for the RRRA to apply, 45 U.S.C. § 717(b), I also found that it provided a process which was "fair and equitable" to the Reading's estate. *In re Reading Company,* 378 F.Supp. at 481 (E.D.Pa.1974).

The USRA formulated a planning package for the conveyance to ConRail. A preliminary system plan was filed on February 27, 1975 and a final system plan on July 26, 1975. On April 1, 1976, the Reading's rail assets described in the final system plan were conveyed. The remainder of the estate then consisted of real property, a trucking company, some marine equipment, other investments, and the probable proceeds from the valuation case before the Special Court.

SUMMARY OF THE PLAN

Fundamental to any bankruptcy is the reality that all creditors cannot currently be fully paid in cash. Thus, principles of priority or structuring of creditors are used in a plan of reorganization so that preferred or senior creditors receive a proportionately better share than others.

1. On June 15, 1973, the trustees filed a preliminary Plan of Reorganization for Reading which presented two alternative solutions: public sector intervention through federal legislation or liquidation of the railroad. They hoped for federal rail legislation by the summer of 1973; otherwise, the trustees contemplated submitting a definitive reorganization or liquidation plan on or before November 23, 1973. This date was subsequently extended by Order No.

495. Finally, on January 2, 1974, the Regional Rail Reorganization Act of 1973 was signed into law.

2. Although the Act provided for the issuance of ConRail securities at conveyance, 45 U.S.C. §§ 719 and 743, they have been withheld pending the outcome of the litigation to determine exactly how much is due.

■ The standards for approval of any priority system under a plan involve a determination that the creditors will be justly compensated in accordance with the fifth amendment, that pursuant to 11 U.S.C. § 205(e)(1) the plan is "fair and equitable" and affords "due recognition to the rights of each class of creditors and stockholders," and that the plan complies with the judicially created absolute priority rule.

Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class receives values allocable to a senior class "comes within judicial denunciation." Beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate. (footnotes omitted)

*In re Penn Central Transportation Co.,* 596 F.2d 1102, 1110 (3d Cir.1979) quoting 6A *Collier on Bankruptcy* ¶ 11.06, at 210–11 (14th ed. 1977).

■ Additionally, the reorganization court must conclude that the plan is feasible, that is, that the new corporation will have enough income to meet its expenses. 11 U.S.C. § 205(b)(4).

■ The present assets of the estate consist of approximately $25 million in cash, between $35 and $45 million in real estate and other investments not conveyed to ConRail,[3] and a potential recovery in excess of $200 million from the valuation case. Under the Plan, many of these retained assets will be liquidated in a very detailed manner. The liabilities of the estate are estimated to be $165 million excluding the fees and expenses of the reorganization. Even though the amount of proceeds, if any, from the valuation case will not be determined for years, the trustees believe that the time is ripe for reorganizing the Reading estate. The retained assets and the problems relating to them are identified. An organization has been created to maximize the return on the retained investments and to liquidate as rapidly as possible retained assets which will not be used by the reorganized company. The Plan of Reorganization has been devised to establish a feasible capital structure and to propose a fair and equitable method of distribution. In this Plan, the estimated value of the corporation's retained assets is co-ordinated with the unknown value of the proceeds of the valuation case. This involves issuing securities based on the outcome of the valuation case, and satisfying various classes of creditors with combinations of cash and securities. The distribution of securities in lieu of cash satisfies the absolute priority rule. *In re Penn Central Transportation Co.,* supra, 596 F.2d at 1110–11 (3d Cir.1979).

■ Generally, a reorganization plan must provide for the claims of administration (expenses of conducting ongoing operations during bankruptcy), secured claims, unsecured claims, and equity interests. However, it is only after satisfaction of the creditors' claims that the stockholders or equity interests are considered. The classification of claims is within the purview of section 77(c)(7) of the Bankruptcy Act, 11 U.S.C. § 205(c)(7) which provides in relevant part:

(7) The judge shall promptly determine and fix ... for the purposes of the plan and its acceptance, after notice and hearing, the division of creditors and stockholders into classes according to the nature of their respective claims and interests. Such division shall not provide for separate classification unless there be substantial differences in priorities, claims, or interests.

---

**3.** Certain claims being litigated may add substantially to the estate. Of course, Reading may also be unsuccessful in them. See Order No. 1392 as to Trailer Train Company and Order No. 1448 as to Blythe Township.

The Reading Plan is structured around eight categories of claimants with various securities being issued to satisfy the debts in each category. The Class A claims include compensation for the trustees and their counsel and costs and expenses incurred in connection with the Plan and reorganization proceedings under sections 77(c)(2) and 77(c)(12). These claims have the highest priority and will be paid in cash at consummation or paid in the ordinary course of business.

Class B claims are those of the federal government arising from loans made to ConRail under section 211(h) of the RRRA for payment of Reading's administrative claims during the pre-conveyance post bankruptcy period and from trustees certificates issued to the United States. These claims will be paid by issuance and delivery of Series A administrative notes, having the highest priority.

Class C claimants include state and local taxing authorities which have not settled prior to the Plan's consummation. Their claims will be partially satisfied in cash and partially in Series B administrative notes which are contingent upon the Reading's receiving additional compensation for the valuation case.

Class D claims consist of other administrative claims which are not reorganization expenses paid at consummation. These debts will be settled in an administrative claims settlement program prior to consummation or will be paid in Series C administrative notes.

Class E claimants are railroads which provided materials and services to the Reading Company six months prior to the petition for reorganization, here prior to May 22, 1971. Traditionally they have been given a higher priority than secured claims since these railroads serviced the Reading, cognizant of its poor financial condition, so that the public transportation system could operate. These six-month creditor claims will receive five percent cash on consummation and 95 percent Series C administration notes.

Class F is comprised of secured creditors holding mortgage bonds. The government guaranteed loans, secured by Series E bonds, will receive cash for a portion of the unpaid interest on the secured claim as of consummation date plus five year Series A bonds paying interest at ten percent to satisfy the accrued but unpaid interest obligation. The principal portion of the claim will be paid by issuing Series C–2 bonds bearing interest at eight percent. Present Series D bondholders will receive cash for a portion of unpaid interest accrued plus six year Series B bonds paying interest at ten percent to satisfy the balance of the accrued but unpaid interest obligation. The principal will be paid by issuing Series C–1 bonds bearing interest at eight percent.

Class G or unsecured creditor claims include pre-bankruptcy personal injury claims and unsecured creditor claims. Personal injury claims will be paid in cash in three equal installments on the Plan's consummation date and on the first and second anniversaries of that date. Other unsecured creditors may choose between a cash settlement equal to 15 percent of their allowable claim and a promissory note in an amount equal to the principal of their claim bearing eight percent interest and payable on April 1, 1988, or 90 days after liquidation of the proceeds of the valuation case, whichever is earlier.

Class H claims involve stockholder's equity. All stockholders shall receive a percentage of stock in the new company equal to the percentage which they held of the aggregate of all preferred and common stock in the old company.

NEW SECURITIES AND THEIR DISTRIBUTION

The Plan provides for the issuance of three types of administrative notes: A through C; four series of reorganization bonds: A through C–2; two types of unsecured creditor notes; and new common stock. The administrative notes, unsecured creditor notes, and reorganization bonds will be secured by mortgage indentures. A description of the new securities detailing the schedule of payment and the rights of

the holder is essential to an understanding of the Plan.

## 1. Series A Administrative Notes

Approximately $31 million in Series A notes will be issued to satisfy the United States government's section 211(h) and trustee certificate claims. These notes will have the highest lien priority and right of payment. The interest rate will be eight percent, compounded annually with accrued interest to be paid at redemption of the notes. They will be due on April 1, 1988, or 90 days after liquidation of all or part of the valuation case proceeds.

## 2. Series B Administrative Notes

The payment of Series B securities will be contingent upon the estate's receiving compensation from the valuation case in excess of the amount allocated to the Reading under the final system plan. An estimated $7½ million in Series B notes have or will be issued in partial satisfaction of state and local real estate claims. Interest at eight percent will be compounded annually with accrued interest to be paid at redemption of the notes. They will be due 90 days after liquidation of all or part of the valuation case proceeds. A lien on any additional compensation awarded by the Special Court will serve as security for these notes.

## 3. Series C Administrative Notes

Administrative claims other than reorganization expenses (which will be paid fully in cash on consummation) will be satisfied by Series C administrative notes. Interest at eight percent on these notes will be compounded annually but payment will be deferred until maturity or redemption. They will be due on April 1, 1988, or 90 days after liquidation of all or part of the valuation case proceeds. The Series C notes will be secured by a lien on the retained assets,

asset disposition proceeds, and the valuation case proceeds.

## 4. Reorganization Bonds

Reorganization bonds in various combinations will be issued to satisfy the Reading's secured creditors—the holders of the 1945 mortgage bonds and government guaranteed loans.[4] These bonds will be secured by a mortgage lien on all the assets of the reorganized company. The bonds will be junior in right of payment and lien priority to the series A and C administrative notes with respect to the retained assets, asset disposition proceeds, and valuation case proceeds and junior to the Series B administrative notes with respect to any additional compensation allowed by the Special Court. The Series A and B bonds are senior to Series C bonds in right of payment and lien priority.

The Series A and B bonds will be issued to satisfy the accrued but unpaid interest as of the Plan consummation date on the government guaranteed loan and the 1945 mortgage bonds, respectively. The Series A issues will be five year bonds which will bear interest at ten percent. One fifth of these bonds will be redeemed each year commencing with the first anniversary date of consummation. The Series B issues will be six year bonds with interest at ten percent. One-sixth of these bonds will be redeemed each year commencing with the first anniversary date of consummation. The interest on both issues will be paid currently. If the necessary cash to pay principal and interest on Series A and B bonds is unavailable, such payments will accumulate and be paid when sufficient asset disposition proceeds become available.

Series C bonds will be issued in consideration for the unpaid principal on the 1945 mortgage bonds and the government guar-

---

**4.** The secured creditor claims stem from two issues of mortgage bonds secured by the same mortgage on Reading's property, the 1924 mortgage administered by Manufacturers Hanover Trust Co. The two issues of mortgage bonds are the Series D, 1945 mortgage bonds, of which $54,070,000. face amount of bonds is outstanding, and the Series E, 1963 mortgage bonds, of which the entire face amount of the issue, $37,500,000 remains outstanding. The 1963 mortgage bonds were issued to secure the government guaranteed loan of which Debtor still owes $23,198,450. in principal.

anteed loan. These bonds will mature on April 1, 1988, or 90 days after liquidation of all or a part of the valuation case proceeds. They will bear eight percent simple interest which will be due and payable only when the bonds mature or are redeemed. At any time prior to maturity and at the reorganized company's option, Series B bonds will be redeemable with accrued interest, on a pro rata basis, so long as administrative notes and bonds with a higher maturity have been paid off. The Series C–1 bonds will be issued to satisfy claims for the unpaid principal obligation of the Series D, 1945 mortgage bonds. The Series C–2 bonds will be issued to satisfy the unpaid principal obligation of the government guaranteed loan. The right of payment and lien priority are the same for the Series C–1 and C–2 bonds; however, only the holders of Series C–1 bonds will be entitled to vote for directors of the reorganized company.

### 5. Unsecured Creditor Notes

Two types of notes will be issued to unsecured creditors: one for personal injury claimants and the other to unsecured creditors. The personal injury notes [5] will not bear interest and will be redeemable and mature one-half on the first anniversary of the Plan consummation date and one-half on the second anniversary. The unsecured creditor notes will bear interest at eight percent simple interest, and will also be secured by mortgage liens on all the retained assets, asset disposition proceeds, and valuation case proceeds. All principal and interest on these notes will be due on April 1, 1988, or 90 days after the liquidation of the valuation case proceeds, whichever is earlier.

The unsecured creditor notes are junior in right of payment and lien priority to the administrative notes and reorganization bonds but senior to any dividends on new common stock. Personal injury notes are senior in right of payment to the unsecured creditor notes.

### 6. New Common Stock

The reorganized company's articles of incorporation will authorize 10,000,000 shares of new common stock of which 2,795,291 shares will be issued on the Plan consummation date. The stock will have a par value of one cent and will not have preemptive rights. Each share will entitle the holder to one vote at shareholders' meetings but the stock cannot be cumulated for voting in any manner.

### 7. Mortgage Indentures

The mortgage indentures will secure the administrative notes and reorganization bonds as well as provide liens securing obligations on all of the assets of the reorganized company. There is one exception: Series B administrative notes will be only secured by a lien on any additional compensation allowed by the Special Court in the valuation case and will be subject to the prior lien of the Series A administrative notes.

The indentures will provide that once the expenses of operation and maintenance have been met, the certificates of value and any additional proceeds from the valuation case and from the asset disposition program will become security for and may be applied to the payment of the obligations of the reorganized company. Any such payments will be free and clear of the liens and encumbrances of higher priority creditors. The mortgage indentures will restrict the ability of the reorganized company to create liens and incur or assume additional indebtedness except in the ordinary course of business and under the conditions specified by the terms of the indentures.

### MAJOR COMPROMISES

In a plan such as the Reading's which is primarily consensual, the importance of compromise cannot be overemphasized. Many settlements have laid the foundation

---

**5.** These notes will constitute two-thirds of the personal injury claims. The first one-third will have been paid in cash at consummation of the Plan. These provisions were part of a compromise reached with the United States.

for the Plan, and the Plan itself is the product of many hours of negotiation. Before describing the various compromises between the major claimants of the estate, some understanding of the presumptions upon which the settlements rely is necessary.

No settlement would be possible without the claimants' agreeing to defer the major portion of the debt until the valuation case proceeds, the largest single asset of the estate, can be used for payment. The valuation case is the ongoing litigation to determine how much money the government owes Reading for the conveyance of its operating assets to ConRail. Under the RRRA, the USRA placed a value on all of the operating assets of the estate in the final system plan. Following the example of the other bankrupt railroads, Reading and its subsidiaries did not accept as the value of their operating assets the $32 million fixed by the USRA. Instead, the Reading began to litigate the issue de novo in the Special Court set up by the RRRA. My learned colleague, Judge Fullam, has already detailed the issues in the valuation case, and I need not repeat his scholarly analysis here. *In re Penn Central Transportation Co.*, 458 F.Supp. 1234 at 1270–76 (E.D.Pa.1978). I agree with Judge Fullam's estimation that the railroads should be optimistic about recovering a value in excess of the amount proposed by USRA for their assets. *Id.* at 1274. Indeed, the SEC in evaluating the Penn Central plan stated: "The expectation of a large recovery from the valuation case is not a matter of contingency or unfounded hope. It is as certain as any event can be." SEC Report at 43. The Third Circuit noted that the Special Court characterized the government's initial offer of payment for the railroad's conveyed properties as "incredible." *In re Penn Central Transportation Co.*, 596 F.2d 1155, 1165 (3d Cir.1979).

The exact amount of recovery, however, is wholly speculative. Under an "alternate scenario," in which the trustees attempt to show what would have happened to their assets without the RRRA,[6] Alfred W. Hesse, Jr., current president of the Reading Company, speculates that it would have received in excess of $328 million. Under the formula suggested by the Special Court in its October 12, 1977, opinion—original cost less depreciation, rehabilitation, and adaptation costs—the Reading should receive approximately $215 million. See, affidavit of Alfred W. Hesse, Jr., ¶ 10, filed August 16, 1979. Although there is a risk that the Reading will not recover a sizeable amount in the valuation case, chances for recovery seem excellent, and claimants which are to receive a percentage of the proceeds of the valuation case as part of the Plan should be fairly certain of some payment. Thus, the consideration of possible valuation case proceeds as a means to satisfy claimants under the Reading Plan is realistic, reasonable, and fair.

The method for evaluating compromises in a railroad reorganization has already been well articulated by Judge Fullam. *In re Penn Central Transportation Co.*, 458 F.Supp. 1234, 1261–64 (E.D.Pa.1978). Basically, two types of compromises are incorporated into a plan of reorganization: settlements agreed to by the concerned parties and already approved by the court apart from the plan and compromises suggested by the trustees in the plan itself without the imprimatur of those involved in the dispute. Both kinds of compromises must be examined in the same way by the reorganization court. As Judge Fullam noted, "[i]t is firmly settled that a Plan may be approved which embodies compromise resolution of conflicting contentions, if the approval is based upon an informed evaluation of the strengths and weaknesses of the respective contentions, the likelihood, duration, and expense of litigation which would otherwise be necessary, and the range of possible litigation results." *Id.* at 1261.

---

**6.** The "alternate scenario" is part of the testimony in the valuation case presently before the Special Court in which Reading attempts to show that it could have sold at least part of its rail properties to profitable carriers or public bodies for rail use at prices far higher than those determined by the USRA. See, affidavit of Alfred W. Hesse, Jr., filed August 16, 1979.

In assessing the reasonableness of each individual settlement, it is crucial to remember that these pieces are combined into one plan of reorganization. This unit cannot be disturbed without damaging the intricate balance established through extended negotiations. The treatment of one class of claimants must be examined in light of the overall Plan.

The power of the reorganization court to approve a plan embodying compromises does not mean that objections are ignored. On the contrary, the objections to the Reading Plan were carefully considered. However, no one involved in the Reading reorganization has advocated that the Plan should be totally abandoned unless the wishes of its class are met. The approval of the Plan necessarily entails the sacrifice of some individual demands. For the reasons expressed in the following sections, I conclude that the individual compromises incorporated into the Reading Plan satisfy the test of fairness and equity and are within the range of possible and reasonable litigation results.

### 1. United States claims

The main compromise which makes all other agreements possible is the waiver by the United States of its first priority claim to which it is legally entitled under section 211(h). 45 U.S.C. § 721(h), Transcript of hearings on the Plan 9/17/79 pp. 5–7.[7] Section 211(h) amended the RRRA to allow the bankrupt railroads to borrow money from the government through ConRail to pay necessary pre-conveyance expenses. In return, the Reading had to recognize the loan as a current administrative expense and provide that full repayment would have a priority superior to any other claims. Congress granted this "superpriority" since the government made railroad service possible during bankruptcy. If the United States asserted its priority and insisted on cash, there would be no available funds for any other claimants. Obviously, the decision of the United States to accept Series A administrative notes instead of cash is not challenged by any claimant.

Currently, Reading owes the United States approximately $4.8 million plus interest for a loan to purchase 57 locomotives and approximately $19 million plus interest for advances under the section 211(h) loan program. The total amount owing the government in this first priority class is estimated to be over $31 million. Exhibit B to the Plan.[8]

A condition to the United States' approval of Reading's Plan of Reorganization was the payment of $5 million in cash to the government. However, the United States agreed to waive this payment if the trustees could draw down cash for the payment of about $5 million in section 211(h) eligible

---

**7.** Section 211(h)(4)(D):

(D)(i) Except as provided in clause (ii) of this subparagraph, any funds held in an escrow account by a railroad in reorganization on October 19, 1976, which are thereafter determined to be cash and other current assets of the estate of such railroad in reorganization for purposes of paragraph (3) of this subsection, shall be applied as follows—
(I) first, to the reduction of any outstanding loans to the Corporation by the Association, pursuant to paragraph (1) of this subsection, the proceeds of which were used to discharge obligations of such railroad in reorganization;
(II) second, to the Association to the extent of any such loans which have been forgiven pursuant to paragraph (5) of this subsection; and
(III) third, to the payment of any remaining obligations of such railroad in reorganization, in accordance with the provision of the agency agreement entered into pursuant to paragraph (2) of this subsection.
(ii) The manner of disposition set forth in clause (i) of this subparagraph shall not apply with respect to a railroad in reorganization if the Secretary (I) determines that a different disposition of assets is necessary to carry out a reorganization plan of such railroad in reorganization, and that such different disposition adequately protects the interest of the United States, and (II) transmits his determination to the court having jurisdiction over the reorganization of such railroad.
45 U.S.C. § 721(h)(4)(D).

**8.** This excludes a disputed $891,801 of section 211(h) drawdowns by ConRail to pay Debtor's retired employees' single premium life insurance premiums. All these amounts owing the government will be satisfied in the highest priority Series A administrative notes.

claims. I authorized such a payment in my opinion and Order No. 1772.

After careful review of the treatment of the United States under the Plan, I conclude that the provisions for the United States' claims are fair and reasonable.

### 2. Claims by Other Railroads

#### (a) Leased Lines

Reading had a 999 year lease with the Philadelphia, Germantown, and Norristown Railway Company and its wholly-owned subsidiary, the Plymouth Railroad Company. The Reading also had shorter leases, 990 years, with the Delaware and Bound Brook Railroad and the North Pennsylvania Railroad Company. In anticipation of conveyances in 1976, settlement negotiations were commenced between Reading and its leased lines. Under the terms of all of these settlements, the trustees were to give a substantial cash advance to the leased railroads and take responsibility for all real estate taxes up to the date of conveyance. In exchange, the leased lines promised to share equally with the Reading in the proceeds of any recovery for operating assets conveyed to ConRail or for nonoperating assets sold to others. Reading also agreed to manage the retained, nonoperating properties for a fee. The settlements included the forgiveness of claims for delinquent rent and the mutual release of all claims. See Hearing Order Nos. 1096, 1097, 1098. I approved these settlements with the leased lines on July 27, 1976. See Order Nos. 1126, 1127, 1128. In respect to the Plan, Reading does not owe any money to the leased lines. However, the interest of the Reading in any proceeds which the leased lines will receive from the valuation case will be considered part of the Reading's valuation case proceeds available for distribution to its credi-

tors. I conclude that this treatment of the leased lines is fair and reasonable.

#### (b) Six month and Interline Creditors

Objections to the Plan of Reorganization were originally filed by Erie Lackawanna, Lehigh Valley, Penn Central, and the Committee for Interline Railroads. These claims for payment accrued primarily from per diem and interline accounts for joint use of railroad equipment and track. However, none of these objectors made statements in the hearings on the Plan since they felt settlements were imminent. As expected, the Erie Lackawanna and the Reading signed an agreement on February 13, 1980, which provided for mutual releases of all claims, except those involving personal injuries, upon Reading's payment of $30,007.23 to the Erie Lackawanna. Also, the Erie Lackawanna by letter to the court withdrew its earlier objections to the Plan. In March, 1980, the Penn Central, Lehigh Valley, and the Committee for Interline Railroads submitted stipulations for my approval of settlements. These agreements dealt with various classes of claims: pre-petition/six months creditors,[9] post-petition/pre-conveyance debts, and other post-petition claims.

Reading owes Penn Central approximately $640,000. in pre-petition claims. Under the agreement I approved, half of them were deemed Class E or "six-month claims." On consummation five percent of their total will be paid in cash and 95 percent in Series C administrative notes. The other half were deemed general creditor claims and will be secured by an indenture lower in priority and payment than administrative notes and reorganization bonds.

Reading's post-petition, pre-conveyance debts to Penn Central total $1,828,998. These claims fall within section 211(h) eligi-

---

**9.** Judge Fullam described in detail the prerequisites for this six month priority in his *Penn Central* opinion, 458 F.Supp. at 1319–28.

Before any right to priority under the six months rule can be established, it must appear that the obligation was incurred as an expense of current operations, in the ordinary course of business, for materials or services used in the operation of the railroad, that the creditor expected to be paid out of the current operating receipts of the railroad (as distinguished from reliance upon the general credit of the railroad); and that the claim arose within six months before the filing of the petition.

*Id.* at 1321.

ble,[10] administrative claims. The settlement allows for an immediate payment of one-third cash and two-thirds cash held in escrow with payouts on the first and second anniversaries of the settlement's approval.

The status of the post-petition Penn Central trust fund claims is still being negotiated and a final agreement on these items will be presented to me for independent approval apart from the Plan.

The stipulation of settlement with Penn Central was approved as fair and equitable on May 21, 1980. See Order No. 1803. Thus, the objections of Penn Central to the Plan were withdrawn.

The Lehigh Valley Railroad had a post-petition, pre-conveyance interline freight claim of $838,447.18 against the Reading which falls within the section 211(h) eligible, administrative category. The settlement provided for the cash payment of one-half of the total claim on October 15, 1979, with the rest to be escrowed and paid out with interest on October 15, 1980. See Order No. 1803, and, consequently, Lehigh Valley's objections to the Plan were resolved.

The Committee of Interline Railroads (Interlines) is a group of approximately 76 railroads which transported freight and passengers, exchanged cars, and performed other services with and for Reading. It has both pre-petition and post-petition claims, amounting to $2.1 million and $187,000 respectively. The settlement provides that one-half of the pre-bankruptcy claims will be classified as Class E, entitled to receive five percent cash on consummation and the balance in Series C administrative notes. The other half of the pre-petition amount will be considered an unsecured creditor's claim and satisfied as such.

The post-petition Interline claims were eligible for satisfaction through section 211(h) loans. I previously authorized their payment once adjustments have been made under the appropriate Association of American Railroad Rules, in such amounts as are then determined to be due. See Order No. 1772.

I found this Interlines settlement fair and equitable on May 21, 1980. See Order No. 1803. Thus, the objections of the Interlines to the Plan were withdrawn.

One other railroad claim matter should be mentioned. Certain obligations are still outstanding between Reading and ConRail with negotiations still in progress. The amounts in issue are not so great as to upset the Plan. Therefore, whether an agreement is reached or some adjudication is required, the approval of the Plan need not be delayed.

STATE AND LOCAL TAX CLAIMS

1. Description of Claims

At one time Reading was faced with approximately $10.2 million in state and local real estate tax claims, $6.6 million in corporate state tax claims, and $263,000. in other tax claims. Since 1978, Reading has reached settlements with various taxing authorities until only $938,000. in real estate taxes and $37,000. in corporate taxes presently remain unresolved. Among the principal outstanding tax balances is New Jersey's franchise and real estate tax claims estimated to be $255,000.

When the hearing on the Plan was held, the Commonwealth of Pennsylvania joined New Jersey in objecting to the Reading's treatment of tax claimants. After much negotiation, Reading and the Commonwealth agreed upon a basis to settle all of the Commonwealth's taxes. Under its terms, the Commonwealth would forgive $1 million in taxes, and the Reading would pay $7 million to satisfy the balance of $6.4 million in Class D state and corporate taxes and approximately $1.6 million in Pennsylvania Utility Realty Taxes, 30 percent in cash and the rest in securities. After hearing, I approved this settlement as fair and equitable. See Order No. 1794.

The bulk of Reading's other tax obligations had been for real estate taxes owing to state and local governments. A major

---

**10.** These post petition, pre-conveyance claims are primarily interline freight claims eligible under section 211(h)(iii). See 45 U.S.C. § 721(h)(1)(A)(iii).

settlement for $6.5 million with the City and School District of Philadelphia involved payment of 30 percent of the claim in cash and 70 percent in Series B notes. After hearing, I approved this agreement as fair and equitable and directed the Reading to offer the same terms to settle the remaining real estate claims. See Order No. 1519; *In re Reading Company*, 463 F.Supp. 528 (E.D.Pa.1978). At present approximately 80 taxing authorities have settled $2.9 million in claims against the Reading on terms similar to that of Philadelphia. The Plan utilizes this same 30 percent cash/70 percent securities package to pay the remaining tax claimants. The State of New Jersey has consistently objected to the Philadelphia agreement and the Plan's treatment of state and local tax claims.

### 2. Objections of New Jersey

The state of New Jersey objects to the Plan on many grounds (1) failure to provide for prompt cash payment as statutorily required for administrative tax claims; (2) failure to recognize and provide for interest at the statutory rate on unpaid administrative tax claims through consummation; (3) inclusion of non-real estate tax claims in the same class for voting as other administrative claims; and (4) construing tax claims which have settled as voting for approval of the Plan.

New Jersey argues that its administrative tax claims must be satisfied in cash instead of the Plan's provision of 30 percent in cash and 70 percent in securities. New Jersey contends that 28 U.S.C. § 960 and section 77(e)(3) of the Bankruptcy Act, 11 U.S.C. § 205(e)(3), mandate cash payment of current taxes unless exceptional circumstances exist.

I found the necessity for the continued operation of the railroad sufficient justification to defer tax payments soon after the Reading filed its petition for reorganization. See Order No. 186. A similar deferral of taxes was allowed in *Penn Central* as necessary to the maintenance of a railroad system operating at a loss for the public good. *In re Penn Central Transportation Company*, 325 F.Supp. 294 (E.D.Pa.1970) aff'd 452 F.2d 1107 (3d Cir.1971) cert. denied *New Jersey v. Penn Central Transportation Company*, 406 U.S. 944, 92 S.Ct. 2043, 32 L.Ed.2d 31 (1972).

New Jersey interprets the Third Circuit's approval in *Penn Central* as mandating that the tax deferral be temporary and be terminated at the earliest possible date. New Jersey contends that the Plan's provision of 70 percent in Series B notes defers payment until the Special Court determines whether any additional compensation will be owing pursuant to the valuation case. The earliest projection for completion of the valuation case is 1988.

The Reading trustees counter that notwithstanding the deferral of taxes pursuant to Order No. 186, the Reading has paid New Jersey a substantial portion of its real estate tax claim. Of the $600,000. once claimed by New Jersey, Reading has paid approximately $350,000. The trustees argue that a continued deferral of the remainder is proper since the conveyance to ConRail included properties upon which tax liens were assessed. The conveyance was free and clear of those liens, which were then transferred to the proceeds of the sale, that is, to the valuation case, and New Jersey must look to those proceeds for payment. Judge Fullam in his *Penn Central* opinion aptly summarized the complex problems involving tax claims.

> The impact of [the Rail Act] upon the status of the claims for state and local taxes, and upon the relationship between those claims and the claims of other creditors, cannot be overemphasized. Because continuation of loss operations was mandated, the amount of unpaid tax claims and other unpaid administration claims was greatly increased, probably by more than half a billion dollars in the aggregate. At the same time, the rights which such claims would have on liquidation (which is the standard for assigning 'value' to all claims in the present context) were significantly altered; moreover, the nature and extent of this alteration could well provide the grist for many years of litigation ...

The liquidation rights of the tax claimants in the present ,circumstances are quite different. In the first place, the properties against which roughly three-fifths of the tax claims are assessed have been conveyed to ConRail free and clear of all liens, including tax claims. With respect to pre-petition taxes, this means that the liens are transferred to the proceeds to be derived from the Valuation Case; but realization from that source is deferred and uncertain. With respect to post-petition taxes, the problem is one of the proper allocation of administration expenses. That is, it cannot be assumed that post-petition taxes, even though they are administration claims, would be satisfied promptly by retained assets, in the event of liquidation. Assuming the validity of the Government's superiority, the tax claims would not have access to cash or other liquid assets, and could not be satisfied from sales of retained assets without doing violence to mortgage liens upon retained assets. The notion that tax claims generated by conveyed assets would automatically be transferred to, and prime existing mortgages on, retained assets is one which would not likely be accepted by mortgagees without a struggle. 458 F.Supp. at 1277–78.

The Plan's treatment of tax claims by payment in cash and securities is a fair and equitable solution to these difficult problems.

■ New Jersey argues that section 77(e)(3) of the Bankruptcy Act requires payment of administrative claims in cash unless the claimant agrees otherwise. Section 77(e)(3) states:

(3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same. 11 U.S.C. § 205(e)(3).

The trustees dispute New Jersey's interpretation of the statutory language. Reading argues that "costs of administration" refers to expenses directly associated with the reorganization proceedings, such as compensation for trustees and attorneys. See *In re Penn Central Transportation Co.,* 458 F.Supp. 1234, 1282 (E.D.Pa.1978). Deferred taxes would properly fall under "claims" in section 77(b) the rights of which may be modified by the Plan of Reorganization. I agree.

Furthermore, the trustees contend that New Jersey's interpretation requiring agreement to the Plan by every taxing authority would allow one "holdout" administrative claimant to destroy the carefully interwoven pattern of compromises. The reorganization court must be allowed flexibility to preserve the compromises embodied in the Plan by approving a fair and equitable treatment of administrative claims over a taxing authority's objection. Compromise is the key to a consensual Plan. The trustees point out that the United States, a creditor of the highest priority, accepted securities in lieu of cash in satisfaction of its claim. New Jersey is receiving a greater percentage of its claim in cash than any other claimant except those in Class A whose demands arise from reorganization.

■ New Jersey's major objection is its insistence that the word, "payment," in section 77(e)(3) of the Bankruptcy Act requires payment in cash not securities. New Jersey contends that the absolute priority rule prohibits distribution of any cash to junior claimants before tax claims are fully paid, i.e., administrative claimants may be paid in a form other than cash only if no cash is available. I agree with the trustees that the absolute priority rule as applied to railroad reorganizations does not mandate such an inflexible policy.

The Third Circuit in *Penn Central* recognized the need for a pragmatic and flexible approach to priorities in reorganization. The court analyzed the purpose of the absolute priority rule as ensuring that senior creditors receive full compensatory treat-

ment before the next class is allowed to participate. The Third Circuit noted the difference between determining priorities in a reorganization as opposed to a liquidation.

First, in a reorganization the aggregate value of the debtor's assets is determined, not by a judicial sale, but by a hypothetical—albeit expert—calculation of their future worth to the enterprise. Second, claimants are satisfied not with cash, but with securities which reflect an apportionment of value in an ongoing business enterprise. It has long been recognized that these features of the reorganization process make it wholly unreasonable to expect that any plan will meet with precision the standards of the absolute priority rule. *In re Penn Central Transportation Co.*, 596 F.2d 1102, 1110 (3d Cir.1979). It is clear from this analysis that the Third Circuit realized the necessity and legality of satisfying reorganization claimants with securities. The court found support for its approach of flexibility in pursuit of feasibility in these words from the Supreme Court:

The absolute priority rule does not mean that bondholders cannot be given inferior grades of securities, or even securities of the same grade as are received by junior interests. Requirements of feasibility of reorganization plans frequently necessitate it in the interests of simpler and more conservative capital structures. And standards of fairness permit it.

. . . . .

Practical adjustments, rather than a rigid formula are necessary. The method of effecting full compensation for senior claimants will vary from case to case.... [W]hether in case of a solvent company the creditors should be made whole for the change in or loss of their seniority by an increased participation in assets, in earnings or in control, or in any combination thereof, will be dependent on the facts and requirements of each case. So long as the new securities offered are of a value equal to the creditors' claims, the appropriateness of the formula employed rests in the informed discretion of the

court. *Consolidated Rock Products Co. v. Du Bois,* supra, 312 U.S. [510 at 528–30, 61 S.Ct. [675] at 686–87 [85 L.Ed. 982] (footnotes omitted).

quoted in *In re Penn Central Transportation Co.,* supra, 596 F.2d at 1111 (3d Cir. 1979).

The Reading's treatment of state and local tax claimants reflects the trustees' best estimate of the real worth of the tax claims compared to the rest of the claims against the estate. Reading does not acknowledge it owes what New Jersey demands. Principally, the Reading contends that a reduction in its tax liability is warranted since the state insisted the Reading operate, even at a loss, to serve New Jersey residents. Still, the Reading proposes to satisfy the tax claimants with a significant portion of the claim in cash and the remainder in Series B notes, high priority securities.

At the hearing on the Plan, New Jersey offered the testimony of Mr. Roland Machold, Director of the State's Division of Investments, to prove that the Series B and C administrative notes were speculative and inferior. Although these securities are based on the outcome of the valuation case, Mr. Machold had not read any of the testimony presented to the Special Court. As previously discussed, Reading's optimism for a substantial recovery from the valuation case is shared by the SEC, Judge Fullam, and the Third Circuit in analyzing *Penn Central.* I conclude that the Plan's satisfaction of state and local tax claimants by 30 percent cash and 70 percent Series B administrative notes fully compensates Class C claimants under the absolute priority rule and complies with the fair and equitable requirement of section 77.

New Jersey further maintains that Reading's treatment of its tax claims violates the fifth and tenth amendments to the Constitution. The State argues that any deferral of tax payment without the State's consent is tantamount to a requisitioning of State property, and the fifth amendment would require just compensation for such a government taking. Just compensation

puts the creditor in as good a financial position as if the property had not been taken. New Jersey contends this means cash payment.

I agree with the trustees that deferral of taxes cannot be construed as a taking since it does not impermissibly impair the rights of tax claimants. Similarly, there is no constitutional requirement that administrative claims be paid only in cash. In a reorganization proceeding, satisfaction of tax claims in cash and securities is just compensation. Indeed the Supreme Court held that "no decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 150, 95 S.Ct. 335, 362, 42 L.Ed.2d 320 (1974).

▪ The tenth amendment is allegedly infringed by Reading's payment of tax claims in cash and securities since this is an impermissible intrusion by the federal government on the state's right to assess and collect taxes. New Jersey cites *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) in support of this assertion. In *National League of Cities* the Supreme Court invalidated an amendment to the Fair Labor Standards Act extending minimum wage-maximum hour provisions to state and local governments. The Court held that the amendment would directly interfere with the state's exercise of its day to day function as a public employer. The Court articulated the tenth amendment standard in this way.

Congress may not exercise that [commerce] power so as to force directly upon the State its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. 426 U.S. at 855, 96 S.Ct. at 2476.

The deferral of state taxes due to a rail reorganization does not impose changes on the conduct of integral state government functions. The entire tax claim involved here is $255,000. The Plan would allow the trustees to pay 30 percent in cash and 70 percent in securities instead of the full amount in cash as New Jersey favors. The deferral of approximately $175,000 of immediate cash payment is hardly disruptive of the day to day functions of an entire state. I conclude that the payment of tax claims in cash and securities is not violative of the tenth amendment.

Finally, New Jersey raises several objections which I do not need to decide at this time. The State argues that the Plan fails to provide interest for its principal claim at the statutory rate. This objection can best be decided when the exact amount of all claims are adjudicated. What is presently before me is the fairness and equity of the ranking of claims and their treatment as part of one Plan.

The State's objection concerning voting procedures is similarly premature. New Jersey disapproves of tax claimants being grouped with other administrative claimants as one class for voting purposes. Also, the Plan deems those taxing authorities who have accepted the Philadelphia settlement as voting for the Plan. These contentions properly should be raised at consummation rather than the approval stage. However, I direct the trustees to keep separate lists of the votes of tax and nontax administrative claimants and the settling and non-settling tax claimants.

## FEASIBILITY OF THE PLAN

In addition to determining whether or not the Plan's allocation of Reading's available assets to its debts is fair and reasonable, I must also determine whether the Plan is feasible.

Section 77(b)(4) of the Bankruptcy Act requires, in pertinent part, that a plan

(4) shall provide for fixed charges . . . in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof. 11 U.S.C. § 205(b)(4).

Judge Fullam further articulated the standard in his *Penn Central* opinion:

The design of the capital structure of the reorganized enterprise must be such that the Debtor's earnings will support the new capital structure. The reorganized company must be reasonably likely to be able to comply with the requirements of the securities issued. That is, it must be reasonable to suppose that the reorganized company will be able to meet when due the payments required by the new debt securities, and that it will have sufficient earnings to enable it to pay dividends and grow, so that its equity securities will have value. *In re Penn Central Transportation Company*, 458 F.Supp. 1234, 1247 (E.D.Pa.1978).

In the historic railroad reorganization, feasibility referred to the reorganized company's ability to succeed in the railroad business. The question was whether it could generate sufficient revenues to meet its operating costs and support a pared down debt structure. The Penn Central problem was different, but analogous. Penn Central had subsidiary businesses which with proper management could be expected to yield far more through their operation than could be realized through their liquidation.

In contrast, Reading's sources of income are limited to rents, interest and dividends, and the operations of a comparatively small coal company. A major portion of its money over the next five years will come from its assets disposition program. Reading's total receipts, however, will not provide enough to pay off its obligations and success in the valuation case is the key to the ultimate discharge of the debts. Although optimism prevails about the chances of a substantial recovery in the valuation case, this will only occur if litigation efforts are diligently pursued. The present Plan does not—and cannot—provide the questions, much less the answers, as to what Reading's income and expenses will be if it acquires some sort of operating or manufacturing business. Thus, feasibility, in the present context only deals with whether projected income and the proceeds from the disposition of assets will enable it to pay its expenses, liquidate its debts on schedule, and seek a satisfactory result in the valuation case.

The sole objection as to feasibility also came from New Jersey. In itself, New Jersey's claim is minimal and it could be paid at any time. It is only important because if New Jersey is afforded the favorable treatment it wants, similar demands from other tax claimants might be provoked. If they were met,[11] the feasibility of the Plan would be jeopardized since the outflow of cash would leave nothing to fund the valuation case litigation. It is for this reason, and this reason alone, that the assertions of New Jersey have been considered so fully.

In support of their opinions that their Plan is feasible the trustees and their staff made various studies and projections. Their approach was to be conservative insofar as receipts were concerned and realistic about disbursements. Their forecast was attached to the Plan as Exhibit A. In summary it shows the following: (all figures are in millions)

|  | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|
| Beginning cash balance | $25.0 | $15.2 | $14.6 | $14.7 | $13.5 |
| Receipts: |  |  |  |  |  |
| Operations | 6.2 | 5.0 | 4.9 | 5.0 | 4.9 |
| Asset Dispositions | 6.0 | 6.2 | 4.5 | 1.4 | 1.9 |
| Total Receipts | $12.2 | $11.2 | $ 9.4 | $ 6.4 | $ 6.8 |

11. This is not to say that they would be met. Claimants who have not settled would not necessarily be governed by a decision as to New Jersey's claim. Although those tax claimants which have settled are protected by a "most favored nations" clause, it would not necessarily govern if immediate cash payment to New Jersey was ordered by the court, as contrasted to Reading's agreeing to pay New Jersey in cash immediately.

| Disbursements: | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|
| Operations and Asset Disposition Program | $ 4.2 | $ 4.2 | $ 2.3 | $ 2.3 | $ 2.4 |
| Plan Disbursements | 17.8 | 7.6 | 7.0 | 5.3 | 5.0 |
| Total Disbursements | $22.0 | $11.8 | $ 9.3 | $ 7.6 | $ 7.4 |
| Net Cash Increase | $(9.8) | $ (.6) | $ .1 | $(1.2) | $ (.6) |

Support for these projections can be found in the affidavits of the trustees and officers of the Reading Company and their testimony given at the hearing on the Plan.

These figures show three things. First of all, the Reading has reasonable expectations that it will be profitable.[12] Secondly, there will be sufficient cash flow to meet the debt payments scheduled by the Plan, and finally, it will have sufficient reserves to prosecute matters before the Special Court. Moreover, there should be enough margin to meet the unexpected and still survive. I reiterate the obvious, however. These figures do not purport to show what will happen if Reading embarks on some new venture. Feasibility, as I use the term, refers only to what the Reading now is, now does, and now plans.

With this understanding, it is plain that the Plan provides a realistic means to pay off its debts on schedule—those in the immediately foreseeable future—and through the pressing of the valuation case, those that have been deferred.

CONCLUSION

For the reasons that have been expressed at length, I conclude that the Plan of Reorganization submitted by Andrew L. Lewis, Jr., and Joseph L. Castle, III, Trustees of Reading Company, Debtor, as amended

1) Complies with all requirements of law;

2) Is feasible; and

3) Is fair and equitable.

Two more things must be said.

First, I have been spared the necessity of re-examining and discussing many of the concepts which govern section 77 proceedings and those under the RRRA because of Judge Fullam's landmark opinion approving the Penn Central plan. There was no point in my repeating except for limited purposes what he had said so well and so recently. On occasion I did so, but obviously, his scholarly work was more than a source of quotations—it was a constant help and guide to my task.

Secondly, the competing interests of the contending parties are best served by a consensual plan. In many respects the compromises which have been reached were achieved through the leadership of the trustees and their staff. In addition, their management skills have provided a viable base on which compromises could be built and against which the chances of ultimate success could be measured. The trustees and their staff deserve my commendation and the thanks of all whose investments they have helped to salvage.

ORDER NO. 1804

AND NOW, this 21st day of May, 1980, I approve the Plan of Reorganization of the Reading Company, as amended by my Order No. 1803, for the reasons expressed in the foregoing opinion.

12. Dividends will be deferred, however, until all reorganization debts have been paid.