## In the Matter of READING COMPANY, Debtor.

### No. 71828.

United States District Court, E.D. Pennsylvania.

Sept. 14, 1995.

Robert P. Frank, David W. Marston, Philadelphia, PA, for Plaintiff.

William C. Mills, Riesenburger & Kizner, Vineland, NJ, for Defendants'/Third Party Plaintiffs' Liaison.

Kevin A. Gaynor, Vinson & Elkins, Washington, DC, for Third-Party Defendants' Liaison Counsel.

Alan D. Greenberg, United States Counsel, U.S. Dept. of Justice, Washington, DC, for Defendant.

## OPINION

DITTER, District Judge.

This case comes before me on a motion to enjoin the United States and numerous third party plaintiffs from prosecuting certain environmental claims against Reading Company. The claims are rooted in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq*, and arise out of a civil action captioned *United States v. Berks Assoc., Inc., et al.*, Civil Action No. 91–4868, 1992 WL 68346 (E.D.Pa.). It is Reading's position that these claims were discharged by my order of December 31, 1980. For the reasons discussed below, I will grant Reading's motion.

**1.** To differentiate between the present Reading Company and its predecessor, I will refer to the

## I. FACTUAL BACKGROUND

### A. The Reading Bankruptcy

On November 23, 1971, Reading's debtor-predecessor, which then operated the Reading Railroad, entered into a proceeding for reorganization pursuant to section 77 of the Bankruptcy Act of 1898, as amended, formerly codified at 11 U.S.C. § 205 (1976) (repealed 1978) ("section 77"). By the middle of 1979, trustees for the Reading Railroad[1] filed an amended plan of reorganization ("the plan"). It included myriad compromises and trade-offs between and among creditors of various kinds and classes, secured and unsecured, including the United States and Reading's stockholders.

On December 18, 1980, after due notice to all the parties then before the court, a hearing was held on any objections to the proposed consummation of the plan. The United States participated as a creditor during these proceedings and asserted pre-bankruptcy secured and un-secured claims arising under the Interstate Commerce Act and Emergency Rail Facilities Restoration Act, as well as post-petition claims arising under the Regional Rail Reorganization Act of 1973. However, the United States did not assert any environmental claim.

At the hearing on the plan, the United States raised no objection. *See In re Reading Co.*, No. 71–828, Memorandum and Order at 2 (E.D.Pa., December 23, 1980) (Memorandum and Order No. 2004) ("bankruptcy order"). The bankruptcy was consummated on December 31, 1980, pursuant to the bankruptcy order, which also contained a broad injunction against future lawsuits. *See* bankruptcy order at 27–28. Reading emerged from reorganization on January 1, 1981.

### B. The Douglassville Site

Around 1941, a solvent recovery and lubrication oil recycling business, eventually known as Berks Associates, Inc., began to operate on a 50–acre parcel of land located on the southern banks of the Schuylkill River, across from Douglassville, Pennsylvania.

latter as the Reading Railroad.

742

From July 6, 1965, until March 12, 1976, the Reading Railroad either shipped its own waste oil or the waste oil of others to this site.

At least twice, once in 1970 and again in 1972, both state and federal officials attempted to remedy contamination in the river near the site. *See* Bill Collins, *Schuylkill Sludge Spill Spreads; U.S. Vows Aid,* PHILA.INQ., July 1, 1972, at 1. Shortly after the 1972 incident, the United States Environmental Protection Agency ("EPA") ordered rail cars from the Reading Railroad for removal of sludge and debris and then ordered storage of the materials in rail cars.

On October 31, 1980, the EPA preliminarily identified the Berks tract as a potentially hazardous waste site. EPA did not, however, inspect or take samples at the site until April of 1982. The preliminary identification served only to ensure that the site would be investigated in the future.

The results of the 1982 investigation led to the property's placement on the National Priority List—a list of the nation's most serious hazardous waste sites. In March of 1985, the operators of the site informed EPA of the Reading Railroad's prior use. United States Memorandum at 7.

On July 31, 1991, the United States filed an action under CERCLA against 36 defendants, not including Reading, to recover response costs incurred and to obtain a declaration of liability for future response costs to be incurred at the site. A number of these defendants subsequently filed a third party complaint against numerous third party defendants, including Reading, seeking contribution under CERCLA § 113(f), 42 U.S.C. § 9613(f); reimbursement under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); restitution, and common law contribution.

## II. DISCUSSION

The site requires $39 to $53 million in cleanup costs. United States Memorandum

at 7. The third party plaintiffs have been designated as potentially responsible parties under CERCLA and could be responsible for bearing the entire cost of the cleanup. They seek to avoid this result and spread the costs of the enormous cleanup over as large a group as possible.[2] Broadly stated, the issue before me is whether Reading must share the costs of the site's cleanup.

### A. Competing Policy Goals

■ Congress enacted CERCLA on December 11, 1980, to address the severe environmental and public health effects resulting from the improper disposal of hazardous waste. With CERCLA, Congress imposed retroactive liability on persons who, prior to the statute's passage, arranged for the disposal of, or transported for disposal, hazardous substances. *In re Penn Cent. Transp. Co.,* 944 F.2d 164, 167 (3d Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). This retroactive liability extended to corporations that had undergone bankruptcy reorganizations prior to CERCLA's enactment. *In re Penn Cent.,* 944 F.2d at 167. CERCLA aims in part at internalizing[3] cleanup costs of hazardous waste sites by holding potentially responsible parties ("PRP") liable for environmental cleanups and providing a mechanism for quick environmental cleanups.

■ Section 77 provided "broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a *fresh start* for a company" that was undergoing reorganization. *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 941 (3d Cir.) (emphasis added), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). This "fresh start" policy lies at the heart of bankruptcy law and, a section 77 discharge could include both "claims" and "contingent claims." *See In re Penn Cent.,* 944 F.2d at 166.

The instant case rests upon the fault line between the bankruptcy code's fresh start policy and CERCLA's policy of internalizing

---

2. Reading is only one of about 600 third-party defendants named in the contribution action. *Reading Company's Petition for Injunctive Relief,* at 3.

3. Internalizing costs means making those who use and profit from an industry bear the costs associated with that industry. It is one of the guiding principles of products liability law and also applies in CERCLA cases.

the cleanup costs of hazardous waste disposal sites.[4] Twenty days after CERCLA's enactment, my bankruptcy order's prohibition against future lawsuits against newly-emerged Reading became effective. The United States failed to assert any CERCLA claim against Reading in that twenty day window. The effect of this failure to assert a claim is the focus of my inquiry. Two cases, *Schweitzer*, 758 F.2d 936, and *In re Penn Cent.*, 944 F.2d 164, represent a logical starting point.

In *Schweitzer*, the United States Court of Appeals for the Third Circuit permitted post-consummation tort actions against reorganized corporations for asbestos-exposure injuries that had occurred prior to the termination of their bankruptcy proceedings. *Schweitzer*, 758 F.2d at 943. The court reasoned that section 77 allowed the discharge of claims and contingent claims but not potential claims, i.e., those where there had been harm but no manifestation of injury. The court explained that until the injury became known, there was no legal relationship between the victim and the tortfeasor and thus nothing that section 77 could cut off. The court noted, however, that in contexts other than torts, such a legal relationship can begin even where no present cause of action exists. *Id.* (citing *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 26–27 (2d Cir.1939)). Thus, in some instances, a claim not yet actionable can be discharged in bankruptcy.

Six years after *Schweitzer* was decided, the Third Circuit considered the interaction between the Bankruptcy Code and CERCLA. In *In re Penn Cent. Transp. Co.*, 944 F.2d 164 (3d Cir.1991), the court held that a CERCLA claim arising postconsummation was not discharged and was actionable against the reorganized company that emerged from bankruptcy. *Id.* at 165. In arriving at its decision, the court reasoned that because CERCLA had not yet been

enacted when the bankruptcy was consummated, the bankruptcy discharge did not apply to the subsequent CERCLA claim. The Third Circuit relied upon the *Schweitzer* "exception" and found that as in *Schweitzer*, "at the time of the Consummation Order, there was no statutory basis for liability to be asserted," because CERCLA had not yet become law. *Id.* Thus, when the lower court discharged all claims pending against the debtor-predecessor, there was no CERCLA "claim," contingent or otherwise, to discharge. *Id.* at 167–68.

The Third Circuit also found, however, that a "contingent claim"—i.e., one capable of discharge as part of a bankruptcy decree—would have existed had CERCLA been enacted before the bankruptcy's consummation. In the words of the court, "it was not until the passage of CERCLA that a legal relationship was created between the [CERCLA claimants] and [the debtor] relevant to the [CERCLA claimants'] potential causes of action such that an interest could flow." *Id.* at 168.

### B. Contribution Under CERCLA § 113(f)

Based on *Schweitzer* and *In re Penn Cent.*, Reading contends that a claim existed against its predecessor at the moment CERCLA was enacted and that this CERCLA claim was then discharged pursuant to the bankruptcy's consummation order twenty days later. With its liability for its predecessor's acts discharged, Reading asserts it is not liable for CERCLA contribution because CERCLA contribution can only be awarded against a party which is otherwise liable under the statute. Therefore, Reading concludes, the third party plaintiffs can assert no claim against it. Third party plaintiffs reply that because Reading did not become liable to them until after the bankruptcy discharge,[5] the discharge does not affect this

---

**4.** The tension and complexity created by the interaction of bankruptcy and environmental law has proved difficult for courts to resolve. As the Seventh Circuit noted, "[t]he interface of bankruptcy laws and environmental laws has perplexed courts since the passage of [CERCLA]." *In re Chicago, Milwaukee St. Paul & Pac. R.*, 974 F.2d 775, 777 (7th Cir.1992).

**5.** Third–Party Plaintiffs were sued in the underlying CERCLA claim on July 31, 1991, some eleven years after the Reading Railroad bankruptcy was consummated.

case and they still have a viable CERCLA contribution claim.

██ The third party suits against almost 600 third party defendants, including Reading, are based upon the theory that these other parties contributed to and are therefore also potentially responsible parties ("PRP") for the hazardous waste at the site. When one PRP sues another PRP to recover cleanup costs incurred under CERCLA, the suit is properly treated as one for contribution. *See United Tech. Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96 (1st Cir.1994); *Transtech Indus., Inc., v. A & Z Septic Clean,* 798 F.Supp. 1079, 1086 (D.N.J.1992), *appeal dism'd,* 5 F.3d 51 (3d Cir.1993). Congress explicitly stated when CERCLA contribution is permissible in § 9613(f) and it is that provision which controls third party plaintiff's potential right to recover against Reading.[6]

Section 9613(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable, or potentially liable under section 9607(a)...." Section 9607(a)(4)(A) provides that a party is liable to the United States for "response costs" where there is a "release or threatened release" of a "hazardous substance" from a facility. Even if the elements that create § 9607(a)(4)(A) liability exist, however, contribution need not be paid if the underlying liability was dis-

charged in bankruptcy. Therefore, to decide whether Reading is now liable to third party plaintiffs for contribution under § 9613(f), I must determine whether Reading is liable or potentially liable to the United States under § 9607(a). If § 9607(a) liability to the United States exists on Reading's part, third party plaintiffs may seek contribution pursuant to § 9613(f)(1). If § 9607(a) liability to the Unites States does not exist on Reading's part because all the elements are not present or because liability was discharged in bankruptcy, then third party plaintiffs cannot seek contribution from Reading according to CERCLA's own terms.

### 1. Did the United States Possess a Preconsummation § 9607(a)(4)(A) Claim Against Reading?

██ The only issue surrounding whether the United States possessed a preconsummation § 9607(a)(4)(A) claim against Reading is whether the government incurred preconsummation response costs. *See United States Memorandum at 12–15, 18–20; Reading Memorandum at 15–19.[7]* Specifically at issue are the costs incurred as part of the 1970 and 1972 cleanups of the site. If these costs were "response costs," then all four elements necessary for a CERCLA claim against Reading existed preconsummation.[8]

---

**6.** Third–Party Plaintiffs allege four theories of recovery against Reading: reimbursement under § 9607(a)(4)(B); contribution under § 9613(f); common law restitution; and common law contribution. Congress, however, explicitly established a CERCLA contribution mechanism which is part of CERCLA's complex cost-distribution scheme. *See In re Chicago, Milwaukee,* 974 F.2d 775, 779. With respect to the state law claims, I find that CERCLA's own contribution provision controls any potential Third–Party Plaintiffs' recovery against Reading because a contrary result under state law could potentially frustrate federal policy. *See United States v. Union Gas Co.,* 743 F.Supp. 1144, 1155 (E.D.Pa.1990). Thus, third-party plaintiffs' claims for restitution and common law contribution are preempted by CERCLA and cannot be pursued.

**7.** In its supporting memorandum, the United States argues that there was no preconsummation CERCLA claim because the United States had not yet incurred "response costs" and did not know in 1980 that Reading arranged for

disposal of hazardous substances at the site. United States Memorandum at 15, 18. With respect to the second of these two points, the United States misapplies both CERCLA's language and judicial precedent. CERCLA's language at no point makes the government's knowledge of the potentially responsible party's identity an element of a CERCLA claim. Likewise, the case law discussing the government's knowledge of a potentially responsible party's identity does so not while assessing the existence of a CERCLA claim, but rather as part of an analysis of bankruptcy discharge. I find that the existence of a CERCLA claim does not turn on the government's knowledge of a potentially responsible party's identity, although knowledge might determine whether an existing claim can properly be discharged by bankruptcy. *See Schweitzer,* 758 F.2d at 944 (knowledge by a creditor of his contingent claim may be constitutionally required before that claim can be discharged in bankruptcy).

**8.** The site is a facility from which there was an actual release of hazardous substances.

Section 9601(25) defines the word "response" as meaning "remove, removal, remedy, and remedial action." Section 9601(23), in turn, defines the words "remove" and "remedial action" as meaning "the cleanup or removal of released hazardous substances from the environment. . . ." In *United States v. Rohm & Haas*, 2 F.3d 1265 (3d Cir.1993), the Third Circuit held that, "if a particular government action qualifies as a 'removal action' under the definition contained in CERCLA, the government's costs are recoverable under the unambiguous language of [§ 9607], *regardless of what statutory authority was invoked by EPA in connection with its action.*" *Id.* at 1274–75 (emphasis added).

In both 1970 and 1972, federal environmental agencies, acting pursuant to the Clean Water Act, 33 U.S.C. § 1321, undertook cleanups of massive releases from the site. United States Memorandum at 6. The United States never recovered its costs from the 1972 cleanup. *Id.* These costs, authorized by the Clean Water Act, are CERCLA "response costs" if they were incurred during "removal actions." *See Rohm & Haas*, 2 F.3d at 1274–75. The costs were incurred as part of CERCLA "removal actions" because the actions involved the cleanup of hazardous substances from the environment. *See* 42 U.S.C. § 9601(23). Therefore, the 1970 and 1972 costs were "response costs," and they can be recovered under CERCLA despite the fact that the Federal government's actions were authorized by the Clean Water Act, not CERCLA. *See Rohm & Haas*, 2 F.3d at 1274–75. Thus, because all four elements for CERCLA § 9607(a)(4)(A) liability existed preconsummation, the United States possessed a preconsummation CERCLA claim.

2. Discharge of Reading's § 9607(a)(4)(A) Liability

 The next issue to consider is whether the United States' CERCLA claim

was discharged by the Reading Railroad's bankruptcy. Unlike *Schweitzer,* where at the time of discharge the plaintiffs had only potential claims, in this case, the United State's claim against the Reading Railroad was fully constituted upon CERCLA's enactment.[9]

 Reading's § 9607(a)(4)(A) liability was discharged upon the bankruptcy's consummation if the United States possessed actual or constructive knowledge of its claim prior to the bankruptcy discharge order and yet sat on its rights. *In re Chicago, M., St. P. & Pac. R.R.*, 3 F.3d 200, 206 (7th Cir. 1993). In deciding whether this sort of actual or constructive knowledge exists, other courts have considered a number of factors including EPA investigations in the area of the site; initial, albeit incomplete investigations by the potential claimant; past spills from the site; and, incurrence of response costs. *In re Nat'l Gypsum Co.*, 139 B.R. 397 (N.D.Tex.1992).

I find that in the present case, the United States possessed preconsummation, constructive knowledge about the Reading Railroad's potential CERCLA liability and, thus, the United State's claim was discharged. Three factors lead me to this conclusion.

First, the United states possessed knowledge that the Berks' site was an environmental trouble spot to which the Reading Railroad was connected. By October 31, 1980, EPA had identified the Berks Associates property as a potential hazardous waste site. *See* United States Memorandum Exhibit A. Although this identification served only to guarantee a future investigation, it evidences EPA's knowledge about potential environmental problems there. This conclusion is supported by the fact that federal officials had already twice responded to environmental cleanup needs related to the site. Moreover, EPA knew, or had the means to know,

9. Both Third–Party Plaintiffs and the United States argue that no CERCLA claim existed against Reading at the time of CERCLA's enactment because EPA had yet to promulgate any regulatory procedures. I disagree with this argument, but even assuming its truth, the outcome remains the same. Under *In re Penn Cent.*, even if a claim was not created upon CERCLA's enact-ment, a contingent claim, capable of Section 77 discharge, certainly was. *See* 944 F.2d at 168 ("it was not until the passage of CERCLA that a legal relationship was created between the [CERCLA claimant] and [the debtor] relevant to the [CERCLA claimants'] potential causes of action such that an interest could flow.").

that Reading's predecessor was linked to Douglassville. EPA knew that the Reading Railroad had operated a rail line to the site. United States Memorandum at 16. In fact, in 1972, EPA ordered the use of Reading Railroad cars to haul waste that was released from the site. Additionally, before and during the bankruptcy proceedings, the Interstate Commerce Commission ("ICC") required the Reading Railroad to file "tariffs," which identified the places between which property would be transported. These tariffs, available to the United States as part of the bankruptcy proceedings, explicitly linked the Reading Railroad to the site. Indeed, they showed that Reading transported hazardous materials to the site.

The government was significantly involved with the Reading Railroad's bankruptcy and in the revamping of the nation's rail system.[10] The government possessed information linking the Reading to the Berks' site. The government possessed information identifying the Berks' site as an environmental trouble area.

Second, vast publicity surrounded CERCLA's enactment which gave EPA notice of its new environmental weapon. *See* George J. Mitchell, *Not a Super Fund,* N.Y. TIMES, Dec. 8, 1980, at 27; Edward C. Burks, *How the Hazardous Waste Superfund Will Work,* N.Y. TIMES, Dec. 21, 1980, at sec. 11, p. 14; *In Congress,* WASH. POST, Dec. 11, 1980, at 10. At an absolute minimum, EPA was aware that environmental problem areas, like Douglassville, would now be subject to CERCLA's additional regulations. Because EPA was aware that the site posed potential serious environmental risks, I find that EPA possessed reasonable knowledge that its new environmental weapon, CERCLA, might likely be applied to the site.

█ Finally, the Reading Railroad bankruptcy was both lengthy and well publicized. The United States was an active participant as a creditor during the proceedings. Fundamental to the role of a bankruptcy creditor is his responsibility to assert all those claims that he has against the debtor. My conclusion that the United States possessed constructive knowledge of its CERCLA claim against Reading is consistent with the usual rules of bankruptcy procedures that require claimants to consider carefully all the possible claims that they have against a debtor before the bankruptcy is consummated. I note in this regard that the Supreme Court consistently has instructed courts to harmonize the policies of environmental and bankruptcy law. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 505–06, 106 S.Ct. 755, 761–62, 88 L.Ed.2d 859 (1986). By finding that the United States possessed preconsummation constructive knowledge of its CERCLA

**10.** In 1973 Congress passed the Regional Rail Reorganization Act (RRRA). Included in its prefatory findings was the statement that in a region that included Pennsylvania, essential rail service was being provided by railroads that were insolvent and attempting to undergo reorganization under the Bankruptcy Act. The RRRA created The United States Rail Association (USRA) and the Consolidated Rail Corporation (Conrail). The former was charged with the responsibility of preparing a Final System Plan that would show which of the region's rail lines could be reorganized into an economically viable freight system. These properties would then be conveyed to Conrail. Included in the USRA's board of directors was the Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of Treasury, or their duly authorized representatives.

A USRA map, *Railroads in Reorganization,* identifies that Reading was one of the railroads in reorganization as of February, 1975, and shows a Reading line that ran from Philadelphia through Pottstown, Birdsboro, and Reading to Pottsville. Douglassville is between Pottstown and Birdsboro.

In July, 1975, the USRA issued its Final System Plan. On p. 281 it included for transfer from Reading to Conrail Reading's trackage from Pottstown to Reading.

The Final System Plan was forwarded to the President of the Senate, the Chairman of the Commerce Committee of the Senate, the Speaker of the House of Representatives, and the Chairman of the Committee on Interstate and Foreign Commerce of the House of Representatives. The forwarding letter was signed by the Secretary of the Treasury, the Chairman of the Interstate Commerce Commission, and a representative of the Secretary of Transportation. All this information, possessed by two members of the cabinet, the chairman of the ICC, and the Congress, is sufficient to impute knowledge to the United States of the Reading Railroad's bankruptcy and involvement with the Berks' site's environmental problems. See *In re Agent Orange Prod. Liability Litig.,* 597 F.Supp. 740, 796 (E.D.NY.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987).

claim, bankruptcy's fresh start policy and CERCLA's quick response policy are both furthered. Moreover, because the facts of this case are unique—few if any bankruptcy proceedings were consummated twenty days after CERCLA's enactment—CERCLA's policy of internalizing cleanup costs will not be undermined. Therefore, because the United States knew that the Berks property posed a serious environmental risk, that the Reading Railroad was linked to that property, that CERCLA was intended to redress serious environmental problems, and that the Reading Railroad was undergoing a section 77 reorganization, I find that it possessed knowledge of its preconsummation CERCLA claim against the Reading Railroad, and that this claim was discharged upon the bankruptcy's completion.

### 3. Reading's § 9607(a)(4)(B) Liability to Third Party Plaintiffs

 Third party plaintiffs maintain that regardless of Reading's § 9607(a)(4)(A) liability to the United States, Reading is liable to them under § 9607(a)(4)(B), which in turn triggers contribution liability under § 9613(f). Section 9607(a)(4)(B) provides that a PRP shall be liable for "any other necessary costs of response incurred by *any other person* consistent with the national contingency plan." 42 U.S.C. 9607(a)(4)(B) (emphasis added). Third party plaintiffs reason that the costs they incur as part of the underlying CERCLA action are "necessary costs of response" which, unlike the response costs incurred by the United States back in the 1970s, did not arise until after the bankruptcy's consummation. They contend that these postconsummation costs create new § 9607(a) liability for Reading which was not discharged by the bankruptcy and which is now a proper basis for their § 9613(f) contribution claim. Unlike the § 9607(a)(4)(A) liability to the United States where there was some dispute about whether all the elements necessary to trigger liability existed precon-

summation, it is clear that the costs incurred by third party plaintiffs arose postconsummation. Thus, the question here is more fundamental: can third party plaintiffs bootstrap a § 9613(f) contribution claim onto purported § 9607(a)(4)(B) liability?

 Contribution is normally only available where joint liability can be imposed. *United Tech.*, 33 F.3d at 101 (contribution as used in CERCLA allows one who has discharged a common liability to recover of another also liable). However, third party plaintiffs reject this traditional contribution principle. They assert that Reading is liable for contribution regardless of whether or not Reading is jointly liable with them to the United States.

The validity of a CERCLA contribution claim between parties who do not share common liability to a third person because one of the party's liability was discharged in bankruptcy is an issue of first impression in this circuit. Courts have considered, however, the relationship between § 9607(a)(4)(B) and § 9613(f) in a series of cases that involve third party defendants who settle with the government and are then sued by other PRPs under § 9607(a)(4)(B). *See, e.g., United Tech,* 33 F.3d 96; *United States v. ASARCO, Inc.,* 814 F.Supp. 951 (D.Colo.1993); *Dravo Corp. v. Zuber,* 804 F.Supp. 1182, 1189 (D.Neb.1992), *aff'd,* 13 F.3d 1222 (8th Cir. 1994). Because CERCLA's own contribution mechanism substantially limits contribution suits by non-settling PRPs against settling PRPs,[11] some non-settling PRPs have sought "reimbursement" from settling PRPs through § 9607(a)(4)(B) rather than "contribution" through § 9613(f)(1). The courts considering this issue have uniformly held that allowing non-settling PRPs to recover against settling PRPs by simply couching their claim as one for "reimbursement" rather than "contribution" would frustrate CERCLA's policy of encouraging PRPs to settle. *See, e.g., Dravo Corp.,* 804 F.Supp. at 1189; *Transtech Indus.,* 798 F.Supp. at

---

11. In 1986, CERCLA was amended explicitly to create, among other things, a contribution mechanism. *See* Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (1986), 42 U.S.C. § 9613(f). As part of the new contribution mechanism, SARA provided that any PRP who settled its CERCLA liability "to the United States or a State ... shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613.

1086–87; *Avnet, Inc.*, 825 F.Supp. at 1139–41. In other words, if CERCLA's contribution protection provision could be circumvented simply by semantic manipulation— i.e., suing a settling PRP for "reimbursement" rather than "contribution"—the incentive provided by the contribution protection provision for PRPs to settle their CERCLA liability with the government would be frustrated. Thus, courts considering this issue have found that while "any person" can bring a cost recovery action under § 9607(a)(4)(B), recovery will be barred if the suit is actually a disguised contribution action. In these masked-contribution claims, the courts have found that ascribing the usual meaning to the word "contribution" solves the potential problem of non-settling PRPs attempting to circumvent CERCLA's own mechanisms. The result is that any claim which satisfies the common legal definition of "contribution" must be brought as a § 9613(f) contribution claim and not as a § 9607(a)(4)(B) reimbursement claim.

I find that uniformity of interpretation, accepted canons of construction, CERCLA policies, and the Bankruptcy Code require that in this case, just as when a non-settling PRP sues a settling PRP, the word "contribution" for purposes of § 9613(f) should be given its plain meaning and that third party plaintiffs cannot predicate their § 9613(f) contribution claim on Reading's alleged § 9607(a)(4)(B) liability.[12] A § 9613(f) contribution claim must be predicated upon common liability to a third-person and cannot be brought against a party whose third-person liability was discharged in bankruptcy.[13] *See, e.g., United Tech.*, 33 F.3d at 101; *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 87–88, 101 S.Ct. 1571, 1578–79, 67 L.Ed.2d 750 (1981) ("Typically, a right to contribution is recognized when two or more persons are liable to the same plaintiff for the same injury . . . .").

■ Whenever possible, courts should interpret a single statutory provision uniformly. As noted above, in the context of a non-settling PRP suing a PRP who settled, there is substantial authority indicating that the term "contribution" as used in § 9613 must be given its plain meaning. *See, e.g., United Tech.*, 33 F.3d at 101. Thus, it follows that outside of the non-settling/settling-PRP context, the word contribution as used in § 9613(f) should also be given its plain meaning. Such an interpretation contributes to a uniform construction of CERCLA, a statute already widely criticized for its complexity and poor draftsmanship. *See In re Chicago, Milwaukee St. Paul & Pac. R.*, 3 F.3d at 201.

■ Under accepted canons of construction, legal terms used in framing a statute are ordinarily presumed to have been intended to convey their customary legal meaning. *Bradley v. United States*, 410 U.S. 605, 609, 93 S.Ct. 1151, 1154–55, 35 L.Ed.2d 528 (1973). In enacting § 9613(f), Congress gave no indication that it intended the word "contribution" to have some special meaning. Absent evidence of such intent, I find that when Congress used the word "contribution" in § 9613(f) it intended that word to have its usual meaning and, therefore, there must be common liability over to a third party before § 9613(f)'s contribution provision applies. Finally, both the Bankruptcy Code's fresh start policy and CERCLA's contribution protection policy for settling PRPs militate in favor of giving the word "contribution" its ordinary meaning in § 9613(f) and thereby requiring common liability over to a third party. In the case of a non-settling PRP who sues a settling PRP, courts have found that CERCLA's policy of encouraging settle-

---

12. Discussing § 9613(f), the First Circuit noted that "[t]aken in the aggregate, this impressive collection of signposts—cannons of construction, other CERCLA language, the statute's structure, the state of the case law antedating SARA's passage, and SARA's legislative history—point squarely to a conclusion that Congress used the word 'contribution' in the conventional sense, and fully intended courts to give the word its customary meaning." *United Tech.*, 33 F.3d at 101.

13. My holding is limited to those situations where a party's third-person § 9607(a) liability was discharged in *bankruptcy*. Outside the bankruptcy context, different policy goals may counsel a contrary result. Moreover, in the instant case, the third party plaintiffs were compelled by the government's underlying CERCLA action to clean up the site. This compelled conduct makes the propriety of alleging § 9607(a)(4)(B) liability against Reading even less appropriate.

ment requires that the suit be brought under § 9613(f) rather than § 9607(a)(4)(B). *See United Tech.*, 33 F.3d at 102 (finding that PRPs should utilize § 9613(f) while *innocent parties* can use § 9607(a)(4)(B)). This policy will be furthered by my holding today because the instant case involves a PRP seeking recovery from another PRP. Consistent with the courts that have considered actions by one PRP against another PRP, I find that Congress intended § 9613, and not § 9607(a)(4)(B), to control the legal relationship between these parties. If I were to accept third party plaintiffs' interpretation, I would permit a round-about way for PRP's to proceed under § 9607(a)(4)(B) by bootstrapping a § 9613(f) claim onto that provision. That is exactly the result that courts in other contexts have rejected.

My holding today will also further the bankruptcy policy of providing debtors with a fresh start. This policy seems especially pronounced in this case, where the Reading Railroad bankruptcy was consummated over fourteen years ago, and Reading now shares little but its name with its debtor-predecessor.

For these reasons, it is clear that the plain meaning of contribution controls this case and precludes third party plaintiffs from asserting a § 9613(f) contribution claim against Reading based on § 9607(a)(4)(B) liability. Accordingly, the absence of common liability between Reading and the third party plaintiffs to another CERCLA claimant is fatal.

## III. CONCLUSION

Contribution under CERCLA is proper if the contribution plaintiff can establish the contribution defendant's liability under § 9607(a). Reading is not liable under § 9607(a)(4)(A) to the government because that CERCLA claim was discharged as part of the Reading Railroad's bankruptcy. Additionally, Reading's potential § 9607(a)(4)(B) liability to third party plaintiffs is not a proper basis on which to assert a contribution claim.