

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-13-1997

# In Re Reading Co

Precedential or Non-Precedential:

Docket 95-1987,95-1988

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"In Re Reading Co" (1997). *1997 Decisions*. Paper 131.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/131

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 13, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 95-1987 and 95-1988

In The Matter of READING COMPANY,

Debtor

United States of America,

Appellant in 95-1987

In The Matter of READING COMPANY,

Debtor

Consolidated Rail Corporation,

Appellant in 95-1988

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 71-cv-00828)

Argued July 15, 1996

Before: SLOVITER, Chief Judge, COWEN and R OTH,
Circuit Judges

(Opinion Filed June 13, 1997)

Robert P. Frank, Esq. (Argued)
Andrew J. Soven, Esq.
Reed, Smith, Shaw & McClay
1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103-7301

John W. Morris, Esq.
Suite 1300
30 S. 15th Street
Philadelphia, PA 19102

 Attorneys for Appellee In Re:
 Reading Co.

Lois J. Schiffer, Assistant Attorney
 General
Alan Tenenbaum, Esq.
Alan D. Greenberg, Esq.
Martin W. Matzen, Esq.
John A. Bryson, Esq. (Argued)
United States Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC 20026

Earl Salo, Esq.
John Wheeler, Esq.
U. S. Environmental Protection
 Agency
Washington, DC 20026

 Attorneys for Appellant United
 States of America in 95-1987

Philip J. Katauskas, Esq. (Argued)
Michael H. Reed, Esq.
Edmund B. Spaeth, Jr., Esq.
Anne M. Package, Esq.
Pepper, Hamilton, Scheetz
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799

 Attorneys for Appellee in 95-1987
 and Appellant in 95-1988
 Consolidated Rail Corporation
 ("Conrail")

**OPINION OF THE COURT**

ROTH, Circuit Judge:

After a decade-long reorganization, the Reading Railroad emerged from bankruptcy on January 1, 1981. On that day, the newly-established Reading Company[1] was given a fresh start by a consummation order which granted Reading protection from all pre-consummation debts and liabilities. Now, sixteen years later, the Consolidated Rail Corporation (Conrail) asks that we circumvent the protection of the bankruptcy discharge and permit Conrail to seek contribution from Reading for environmental clean-up costs. The district court rejected Conrail's claim. We will affirm the judgment of the district court.

This appeal involves a number of issues under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 990499, § 101 et seq., 100 Stat. 1613 (1986). We will first have to determine what type of claim or claims appellants, Conrail and the United States, can maintain against Reading. We

_____

1. In this opinion, we will refer to the bankrupt railroad as the Reading Railroad and the post-bankruptcy, non-rail entity as the Reading Company, or simply Reading.

3

will then consider how Reading's bankruptcy affects appellants' ability to enforce any claims.

As a result of our consideration of these issues, we find that Conrail's only viable claim against Reading is one for contribution under § 113(f). We also find that this claim was not discharged by Reading's consummation order. Nevertheless, we determine that Conrail's claim fails as a matter of law because Reading is not liable to the United States under § 107(a) and consequently Reading cannot be liable to Conrail for contribution of the response costs that Conrail must pay to the United States.

I. FACTS

The roots of this dispute stretch back to November 23, 1971, when the Reading Railroad filed for reorganization under § 77 of the Bankruptcy Act of 1898, formerly 11 U.S.C. § 205 (1976) (repealed 1978). By 1973, seven other major American railroads had joined Reading in reorganization. The seemingly intractable nature of these bankruptcies, combined with the obvious public need for continuing rail service, spurred Congress to action. The result was the Regional Rail Reorganization Act of 1973 ("RRRA"), 45 U.S.C. § 701 et seq., which established a plan for conveying the rail assets of the bankrupt corporations to a new entity, Conrail. The railroads would receive Conrail securities in return for their assets, and the former railroads would then emerge from bankruptcy as new, non-rail entities. See In re Reading Co., 24 B.R. 858, 859-60 (E.D. Pa. 1980).

On May 2, 1974, the district court subjected the Reading Railroad to the RRRA. See In re Reading Co., 378 F.Supp. 474, 481 (E.D. Pa.), aff'd sub nom. In re Penn Central Transp. Co., 384 F. Supp. 895 (Sp. Ct.R.R.A. 1974). On April 1, 1976, Reading Railroad's rail assets were conveyed to Conrail pursuant to the final system plan, In re Reading Co., 24 B.R. at 860, and the company's 5,664 rail employees became eligible for employment with Conrail, Final System Plan of the U.S. Railway Assoc. at 162, reprinted in Supplemental Appendix at 178. "The remainder of the estate then consisted of real property, a trucking

4

company, some marine equipment, other investments, and the probable proceeds from the [rail assets] valuation case . . .." 24 B.R. at 860. For all practical purposes, Reading ceased to be a railroad on April 1, 1976.

The Reading Railroad reorganization continued for another four years. By mid-1979, the Trustees hadfiled an Amended Plan for Reorganization with the district court. On May 21, 1980, after notice to numerous parties including the United States and Conrail, the district court approved the Amended Plan. 24 B.R. at 874. Both the United States and Conrail attended hearings on the plan's confirmation and proposed consummation. Neither objected. On December 23, 1980, the district court entered an order that established December 31, 1980, as the consummation date for the plan.

The most significant feature of the consummation plan for purposes of this appeal was a sweeping injunction which protected the Reading Company from all liability based on the obligations of its predecessor:

7.02 Injunction. All persons, firms, governmental entities and corporations, wherever situated, located or domiciled, are hereby permanently restrained and enjoined from instituting, prosecuting or pursuing, or attempting to institute, prosecute or pursue, any suits or proceedings, at law or in equity or otherwise against the Reorganized Company or its successors or assigns or against any of the assets or property of the Reorganized Company or its successors or assigns, directly or indirectly, on account of or based upon any right, claim or interest of any kind or nature whatsoever which any such person, firm, governmental entity or corporation may have in, to or against the Debtor, the Reading Trustees, or any of their assets or properties . . . by reason or on account of any obligation or obligations incurred by the Debtor or any of its Trustees in these proceedings, except the obligations imposed on the Reorganized Company by the Plan or by this Order or reserved for resolution or adjudication by this Order.

In re Reading Co., Memorandum and Order 2004, Bankr. No. 71-823 (E.D. Pa. Dec. 23, 1980) (Consummation Order

5

and Final Decree). With this injunction in place, the Reading Company emerged from bankruptcy on January 1, 1981.

At the same time that the Reading Railroad's Trustees were drawing up Reading's final plan of reorganization, major developments were taking place in Congress. On December 11, 1980, three weeks before the Reading Railroad's plan consummation date, CERCLA became law, effective immediately. The statute imposed retroactive liability on any person who, prior to the statute's passage, had disposed of, transported, or arranged for the disposal of hazardous substances. In re Penn Cent. Transp. Co., 944 F.2d 164, 167 (3d Cir. 1991). It granted the Environmental Protection Agency ("EPA") broad powers to enforce this mandate. United States v. Alcan Aluminum. Corp., 964 F.2d 252, 258 (3d Cir. 1992).

CERCLA's embrace would encompass Conrail and the nation's railroads. See 126 Cong. Rec. 26,061-62 (1980) (letter to Senator Howard W. Cannon from Richard Briggs, Association of American Railroads) (describing CERCLA as a threat to the railroad industry); Superfund: H.R. 4571, 5290 Before the Subcomm. On Transp. & Commerce of the House Interstate & Foreign Commerce Comm., 96th Cong. 1st Sess. 132 (1980) (statement of Barbara Blum, Deputy Administrator, EPA) (identifying railroads as one type of violator whom CERCLA would address). The EPA demonstrated its awareness of the new law and its immediate applicability to the Reading bankruptcy by notifying Reading prior to discharge that the EPA would treat a hazardous waste site in McAdoo, Pennsylvania, as a CERCLA site. Fifth Report to the Court on the Progress of Cleanup at McAdoo, Pa., In re Reading Co., Bankr. No. 71-828 (E.D. Pa. Dec. 23, 1980). However, neither the EPA nor the United States filed any claims in the Reading bankruptcy; nor did they make any mention in those proceedings of other hazardous waste sites or of the potential for additional hazardous waste liability.

This appeal arises from the clash of CERCLA liability with the discharge granted to Reading as a result of its bankruptcy, a clash which occurred at a fifty acre site on the south bank of the Schuylkill River, opposite

6

Douglassville, Pennsylvania. Since 1941, a business, eventually known as Berks Associates, Inc., had operated a solvent recovery and oil recycling business on the property. On October 31, 1980, 41 days prior to CERCLA's passage, the EPA identified Douglassville as a potentially hazardous site.[2]

The EPA was already familiar with Douglassville because of problems that had occurred there in the early 1970s. In November 1970, heavy rains caused storage lagoons at Douglassville to fail. Two to three million gallons of waste sludge escaped into the Schuylkill River. The Department of the Interior, acting pursuant to the Clean Water Act, 33 U.S.C. § 1251 et. seq., responded to the spill. Two years later, Hurricane Agnes caused a major flood of the Schuylkill, washing more sludge into the river. The EPA responded, invoking the oil spill provisions of the Clean Water Act. As part of the clean-up, the EPA transported sludge from the Douglassville site, using boxcars supplied by the Reading Railroad, which had a rail line serving the facility.

On June 12, 1986, acting pursuant to CERCLA § 104(e), 42 U.S.C. § 9604(e), the EPA requested information from Reading about Douglassville. On June 29, 1988, the EPA designated Reading a potentially responsible party ("PRP"), alleging that between July 6, 1965, and March 12, 1976, Reading had either generated or transported shipments of waste oil to Douglassville. Then, on July 31, 1991, acting pursuant to CERCLA § 106, 42 U.S.C. § 9606, the United States ordered thirty-six PRPs to undertake remedial actions at the Douglassville site. The list of PRPs included Conrail, but not Reading. On the same day, the United States brought an action under CERCLA § 107(a), 42 U.S.C. § 9607(a), against the same group of PRPs for response costs incurred in cleaning up the Douglassville site and for a declaration of future costs. United States v. Berks Assoc.,

_____

2. Further EPA activity took place at the Douglassville site in April, 1982, when the EPA began actively investigating the location. On September 8, 1983, the EPA added Douglassville to CERCLA's National Priorities List, a list of the nation's worst environmental sites. Solvent recovery and oil recycling operations at the Douglassville site ceased in 1985.

7

Inc., Civ. Action No. 91-4868, 1992 WL 68346 (E.D.Pa. Apr.1, 1992).

Conrail and the other primary defendants then brought a third-party action against the Reading Company and six hundred other PRPs, seeking contribution for any liability from the Douglassville site. Reading in turn sought an injunction from the district court, on the basis that any liability, which it may have had, had been discharged in bankruptcy.

The district court granted Reading's request for injunctive relief. In re Reading Co., 900 F.Supp. 738, 741 (E.D. Pa. 1995). The court held that the word "contribution" as used in § 113(f) should be given its plain meaning so that Conrail's action, by one PRP seeking recovery from another PRP, could only proceed as a claim for contribution under CERCLA § 113(f), 42 U.S.C. § 9613(f). Id. at 748. Moreover, because the usual meaning of "contribution" requires common liability over to a third party, Reading's liability to Conrail was dependent on whether Reading was potentially liable to the United States. Id. The district court held that any such liability had been discharged by the bankruptcy consummation order because all the necessary elements of a CERCLA claim existed when the plan was consummated and the United States had constructive knowledge that the claim existed at that time. Id. at 745. As a result, the district court concluded that Reading was not liable to Conrail for contribution. Both Conrail and the United States appealed.

## II. JURISDICTION AND STANDARD OR REVIEW

The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and §1334 (repealed 1978) and 42 U.S.C. § 9613. We take jurisdiction from the district court's final order pursuant to 28 U.S.C. § 1291. This appeal presents issues of statutory interpretation, subject to plenary review. Manor Care, Inc. v. Yaskin, 950 F.2d 122, 124 (3d Cir. 1991). The lone exception is the district court's factual finding of knowledge, see discussion infra, Part III.B., which we review for clear error. See Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278 (3d Cir. 1991); Riehl v. Travelers Ins. Co., 772 F.2d 19, 24 (3d Cir. 1985).

8

III. DISCUSSION

A. The Nature of Conrail's Claim

The core question posed by this appeal is whether Conrail can make a claim against Reading for the costs of the Douglassville clean-up. To answer this question, we must determine the nature of the cause of action that Conrail possesses and whether that cause of action is dependent on Reading's liability to the United States for costs of the Douglassville clean-up. Conrail's third party complaint against Reading alleged four different causes of action: (1) cost recovery under 42 U.S.C. § 107(a)(4)(B), (2) contribution under 42 U.S.C. § 113(f), (3) common law contribution, and (4) common law restitution. We will first address the validity of the common law claims.

Like the district court, we find that CERCLA preempts Conrail's common law theories. See In re Reading Co., 900 F.Supp. at 744 n.6. As the Supreme Court has explained in preemption analysis "our sole task is to ascertain the intent of Congress." California Federal Sav. and Loan Ass'n v. Guerra, 479 U.S. 272, 280 (1987). Congress may manifest its intent when it expressly preempts state regulation, when it implicitly preempts state regulation by so occupying the field with comprehensive federal regulation that it leaves no room for state law, or, again implicitly, when there is an actual conflict between state and federal law. Conflict may arise either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 280-81. We have held that, in enacting CERCLA, Congress did not explicitly preempt all state law, nor did it create a comprehensive scheme of regulation leaving no room for supplementation. Manor Care, Inc. v. Yaskin, 950 F.2d 122, 125-26 (3d Cir. 1991). We must therefore consider the third basis for preemption, actual conflict.

Unlike other areas where we have declined to find an actual conflict between CERCLA and state regulation, see Witco Corp. v. Beekhuis, 38 F.3d 682, 688-90 (3d Cir. 1994) (finding no conflict between CERCLA statute of limitations

9

for contribution and Delaware state law limiting time period for claims against decedent's estate); Manor Care, 950 F.2d at 127 (finding no conflict between CERCLA and cost recovery provisions of New Jersey Spill Compensation and Control Act), we do find a conflict here between Conrail's common law claims for contribution and restitution and the remedies expressly provided in the statute. The conflict arises because the state law remedies obstruct the intent of Congress. Guerra, 479 U.S. at 281. As we explain more fully below, when Congress expressly created a statutory right of contribution in CERCLA § 113(f), 42 U.S.C. § 9613(f), it made that remedy a part of an elaborate settlement scheme aimed at the efficient resolution of environmental disputes. Permitting independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress. We conclude therefore that Conrail's common law claims are preempted by CERCLA § 113(f).

We next turn to Conrail's statutory claims. Conrail contends that it possesses two separate and distinct causes of action, one under § 107(a)(4)(B) and the other under § 113(f). Reading argues on the other hand that Congress's creation of an express provision in § 113(f), governing contribution, superseded the judicially created private right of action that existed under § 107(a)(4)(B). For this reason, Reading contends that Conrail cannot assert a § 107(a)(4)(B) claim when the provisions of§ 113(f) have come into effect. We agree that, in an action which presents a claim for apportionment of clean-up costs, § 113(f) trumps § 107(a)(4)(B).

This interaction between § 113(f) and § 107(a)(4)(B) presents a question of statutory interpretation. We begin our review therefore with an examination of the language of the statute. Section 107 establishes CERCLA's basic framework under which persons are liable for past environmental harms. It sets out four prerequisites for cost recovery:

(1) the defendant falls within one of the four categories of "responsible parties";[3]

---

3. Under 42 U.S.C. § 9607(a), these categories are:

(1) the owner and operator of a vessel or a facility,

10

(2) the hazardous substances are disposed at a "facility";4

(3) there is a "release"5 or threatened release of

_____

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . ..

4. Under 42 U.S.C. § 9601(8), a facility is defined as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of; or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

5. Under 42 U.S.C. § 9601(22), a "release" is defined as:

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions form the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.

11

hazardous substances from the facility into the
environment;

(4) the release causes the incurrence of "response costs."6

42 U.S.C. § 9607; <u>United States v. Alcan Aluminum Corp.</u>,
964 F.2d 252, 258-59 (3d Cir. 1992). Where these
requirements are met, § 107 also establishes four general
categories of damages for which parties are liable. Among
these, § 107(a)(4)(B) provides that a PRP's liability shall
include "any other costs of response incurred by any other
person consistent with the national contingency plan." 42
U.S.C. § 9607(a)(4)(B).7

The "any other costs of response" language in
§ 107(a)(4)(B) forms the basis for Conrail's claim for
recovery under that section. We note that pre-SARA,
Conrail could make a viable claim for contribution under
§ 107(a)(4)(B). As originally enacted, CERCLA lacked any
express mechanism by which one party could recover from
another for paying more than its <u>pro rata</u> share of the costs
of a clean-up. <u>See United Technologies v. Browning-Ferris
Industries, Inc.</u>, 33 F.3d 96, 100 (3d Cir. 1994). Courts filled
this gap by interpreting § 107(a)(4)(B) as providing a private
right of action by which a party, who had expended
resources on cleanup efforts, could obtain contribution
from others. <u>See Key Tronic Corp. v. United States</u>, 511 U.S.
809, 816 n.7 (1994) (noting interpretation); <u>United States v.
New Castle County</u>, 642 F.Supp. 1258, 1269 (D. Del. 1986)
(recognizing cause of action). Until the passage of SARA in
1986, the judicially-created expansion of § 107(a)(4)(B)
served as the sole means by which parties could obtain
contribution.

SARA, however, in § 113(f), 42 U.S.C. § 9613(f), expressly
provided for contribution. The section states:

_____

6. Under 42 U.S.C. § 9601(25), the terms "respond" or "response" are
defined to mean "remove, removal, remedy, and remedial action; all such
terms (including the terms `removal' and `remedial action') include
enforcement activities related thereto."

7. As written, the four categories of damages appear to relate only to
§ 107(a)(4). Courts have consistently ignored this drafting error, and it is
well established that the liability categories apply to all four categories of
PRPs under § 107(a).

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [§ 107(a)] of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. . . . Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

The meaning of the plain language of this section is supported by SARA's legislative history, which states that a principal goal of § 113(f) was to "clarif[y] and confirm[ ] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances." S.Rep.No.11, 99th Cong., 1st Sess. 44 (1985), reprinted in 2 Legislative History of the Superfund Amendments and Reauthorization Act of 1986 at 636 (1990). In passing § 113(f), Congress acted to codify existing federal common law and to replace the judicially crafted measure with an express statutory remedy.

Thus, the language of § 113(f), permitting contribution, replaced the judicially created right to contribution under § 107(a)(4)(B). We find support for this conclusion in the comprehensive scheme that SARA created. SARA's modifications encourage the efficient resolution of environmental disputes by creating a settlement system in which potential damages increase dramatically for parties who refuse to settle. See generally United States v. Charter Int'l Oil Co., 83 F.3d 510 (1st Cir. 1996) (describing scheme). The first part of the system grants protection from contribution actions to settling parties for actions arising from "matters addressed" in a consent decree. 42 U.S.C. § 9613(f)(2). The second part limits the settlement's effect to a reduction in the aggregate liability of the remaining PRPs. Because settlement reduces the total amount recoverable from the remaining, non-settling parties only by the amount of settlement, non-settling PRPs remain liable for

the balance of the aggregate environmental liability. Id. Consequently, PRPs, who choose to settle, gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants. PRPs, who choose not to settle, are barred from seeking contribution from the settling PRPs and thus face potentially disproportionate liability. This system gives the United States obvious and important leverage to encourage quick and effective resolution of environmental disputes.

If a party seeks contribution under § 113(f)(1) from a settling party, the protections of § 113(f)(2) and (f)(3) are immediately applicable. SARA's system operates as intended. But if a party should instead seek contribution under § 107(a)(4)(B), that would throw the proverbial monkey wrench into the works. If a party could end run § 113(f)(2) and (3) by suing a settling party under § 107(a)(4)(B) for "costs of response," the settlement scheme would be bypassed. The incentive to early settlement would disappear, and the extent of litigation involved in a CERCLA case would increase dramatically. Consent agreements would no longer provide protection, and settling parties would have to endure additional rounds of litigation to apportion their losses. This undesirable alternative suggests all the more clearly that Congress intended to replace § 107(a)(4)(B)'s implied contribution remedy when it enacted § 113(f).

Against this authority, Conrail proposes two sources in support of its separate § 107 contribution action. It first points to language in § 113(f), which refers to "a civil action" under § 107(a). The fact, however, that § 113(f)(1) mentions the availability of a civil action under § 107(a) does not a fortiori indicate that Congress intended to permit an action for contribution to be brought either under § 107(a) or under § 113(f)(1), at the discretion of the litigant. After all, a "civil action" can be initiated for direct costs, as well as for contribution.

Conrail's second argument is based on a comment in Key Tronic Corp. v. United States, 511 U.S. 809 (1994), where in dictum the U.S. Supreme Court observed: "the statute [CERCLA] now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar

14

and somewhat overlapping remedy in § 107." Id. at 815-816. To the extent that the Supreme Court refers to an "overlap," we construe this overlap to consist of the fact that some courts have held that a landowner may bring a direct action under § 107(a)(4)(B) to recover its own clean-up costs from a polluter. Accord, Rumpke of Indiana, Inc. v. Cummins Engine Co., 107 F.3d 1235, 1242 (7th Cir. 1997); AM Int'l, Inc. v. Datacard Corp. Inc., 106 F.3d 1342, 1347 (7th Cir. 1997) (holding that a landowner, who paid less because it knew it was buying into an expensive cleanup, was "a little less `innocent' than the landowner described in Akzo" but still might recover under § 107(a)(4)(B) for cleanup of contamination on its property due to a third party spill); Akzo Coating, Inc. v. Aigner Corp., 30 F.3d 761, 765 (7th Cir. 1994) (hypothesizing that "a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands" might, as a private party, have a direct cost recovery action under § 107(a)); United Technologies, 33 F.3d at 100. Like our sister courts, we believe that § 107(a)(4)(B) retains this role. See New Castle County v. Halliburton NUS Corp., ___ F.3d ___ [typescript at 16] (3d Cir. 1997). The fact, however, that a direct action might be brought under § 107(a) does not open the door for a PRP to bring an action for contribution under that same section. Indeed, the fact that § 113(f)(1) specifically permits an action for contribution to be brought "in the absence of a civil action under . . . section [107]" reenforces our conclusion that Congress intended § 113 to be the sole means for seeking contribution--at whatever time in the cleanup process the party, seeking contribution, decides to pursue it.

We rely therefore on CERCLA's plain meaning to hold that § 113(f) replaces the judicially created cause of action under § 107(a)(4)(B) to the extent that a party seeks contribution. See Halliburton NUS Corp., ___ F.3d ___, 1997 WL 217627 (3d Cir. 1997); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1496 (11th Cir. 1996); United States v. Colorado & Eastern Railroad Co., 50 F.3d 1530, 1534-36 (10th Cir. 1995); United Technologies Corp., 33 F.3d at 101-03; Akzo, 30 F.3d at 764-65; Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1989). Having reached this determination, we will proceed to the next step

15

in our analysis: whether Conrail's § 107(a)(4)(B) claim falls within § 113(f)'s ambit.

As its plain language indicates, § 113(f) is concerned with contribution. Although "contribution" is nowhere defined within CERCLA, it is a term with a familiar and readily acceptable meaning. Black's Law Dictionary defines "contribution" as the recovery of "portional shares of judgment from other joint tort-feasors whose negligence contributed to the injury and who were also liable to the plaintiff. . . . The sharing of a loss or payment among several[;] [t]he act of any one or several of a number of co-debtors, co-sureties, etc., in reimbursing one of their number who has paid the whole debt or suffered the whole liability, each to the extent of his proportionate share." Black's Law Dictionary 297 (5th ed. 1979). As the Court of Appeals for the Seventh Circuit has described it, contribution denotes a claim "by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make." Akzo, 30 F.3d at 764; see also Colorado & Eastern, 50 F.3d at 1535-36; United Technologies, 33 F.3d at 101. We have found nothing that counsels against this reading. Accordingly we will adopt it.

In view, therefore, of the language of § 113(f), we have little difficulty holding that Conrail is in fact seeking contribution from Reading and that Conrail must seek that remedy under § 113(f). See Colorado & Eastern, 50 F.3d at 1536 ("In our case, [the] claim . . . must be classified as one for contribution"); United Technologies, ("[a]pplying this definition, the instant action clearly qualifies as an action for contribution under section 9613(f)(1)"); Akzo, 30 F.3d at 764 (explaining that if a party "liable in some measure for the contamination . . . [alleges] that the costs that it has incurred should be apportioned equitably amongst itself and the others responsible . . ., [t]hat is a quintessential claim for contribution"). In its third-party complaint against Reading, Conrail, in its § 107(a) claim, seeks reimbursement for "all" response costs and, in its § 113(f) claim, seeks reimbursement of its "share of contribution" for response costs. Clearly, Conrail is seeking contribution from Reading for all potential liability Conrail may owe to

16

the United States. To the extent that, in either statutory claim, this is Conrail's aim, Conrail's claim is one for contribution. We hold that such a claim must be brought under § 113(f), not under § 107(a).

B. The Effect of Reading's Bankruptcy on
Conrail's § 113(f) Claim

How then has Reading's bankruptcy discharge affected Conrail's claim for contribution. The law of this circuit regarding the discharge of claims in bankruptcy has been established in a series of cases, many of which involve § 77 railroad reorganizations. The leading case is Schweitzer v. Consolidated Rail Corp., 758 F.2d 936 (3d Cir. 1985). In Schweitzer, a group of employees sued Reading after its reorganization for asbestos-related injuries under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq.. Reading invoked its bankruptcy discharge to bar the employees' claims, pointing out that the plaintiff-employees were exposed to the asbestos well before the plan consummation date. We rejected Reading's claim to absolute protection, noting that the language of § 77 provides for the discharge of all "claims" against the debtor. We interpreted this language to mean that the employees' claims would only be discharged if their causes of action existed at the time of plan consummation. 758 F.2d at 941. We explained that "a bankruptcy claim must be based on state or federal law that, wholly apart from bankruptcy, created substantive obligations." Id. (citation omitted). We looked to federal tort law to determine when the claim arose. Noting that identifiable, compensable injury was a basic element of a tort claim, we held that no cause of action accrued until that element had been satisfied. Because the plaintiffs' injuries did not become manifest until after the reorganization, their claims did not exist until after plan consummation, and for that reason the claims were not discharged. Id. at 942; see also In re Central R.R. Co., 950 F.2d 887 (3d Cir. 1991) (following Schweitzer); Zulkowski v. Consolidated Rail Corp., 852 F.2d 73 (3d Cir. 1988) (same); cf. In re M. Frenville Co., 744 F.2d 332 (3d Cir. 1984) (applying Schweitzer analysis to claim for contribution and indemnity arising after automatic stay under Bankruptcy Code).

17

In Schweitzer, we also discussed the concept of a "contingent" claim, that is, a claim which would enable a person to be a creditor in the bankruptcy action even though that person had no present cause of action against the debtor. We found statutory support for such a claim in the language of § 77(b), which defined claims to include "interests of whatever character." 758 F.2d at 942. We cited In re Radio-Keith-Orpheum Corp., 106 F.2d 22 (2d Cir. 1939), as providing an example of a contingent claim. There, the Second Circuit barred the contingent claim of a landlord against the debtor/guarantor of a lease. The court found that because an express contract of guarantee existed, the landlord could not stand idly by while the guarantor went into bankruptcy. The court determined that the claim on the guarantee had been discharged. Id. at 942-43. Schweitzer, however, was a tort claim for personal injury; there was no guarantee, no legal relationship, and no contingent claim that could be discharged.

We have followed Schweitzer in cases involving environmental damage. The first such case was In re Penn Cent. Transp. Co., 944 F.2d 164 (3d Cir. 1991) ("Paoli Yard"). In Paoli Yard, the United States brought suit against Conrail, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), and Amtrak as a result of a release of environmental contaminants at the Paoli Rail Yard. Conrail petitioned to implead the Penn Central Corporation ("PCC"), the reorganized entity that emerged from the § 77 reorganization of the Penn Central Transportation Company ("PCTC"). SEPTA and the United States also brought claims against PCC. As Reading has done in the present case, PCC argued that its § 77 reorganization barred the United States' claim.

Applying Schweitzer, we held that the petitioners' claims were not barred. We first looked to see if a claim existed under CERCLA prior to the consummation date. We held that no claim existed because CERCLA had not been passed at the time of the reorganization:

On October 24, 1978, the reorganization of PCTC was consummated and the injunction against the filing of future lawsuits . . . was entered. We note, however, that at the moment of the bankruptcy discharge and

18

the inception of the injunction, CERCLA had not yet been passed by Congress. Indeed CERCLA was not enacted until 1980. Consequently, at the time of the Consummation Order, there was no statutory basis for liability to be asserted against PCTC by the petitioners. Just as the employees in Schweitzer had no recognizable tort causes of action under the FELA prior to the employer railroad's relevant consummation dates, the petitioners here could not have brought claims under CERCLA prior to the Consummation Date.

Id. at 167.

The Paoli Yard court then turned to the possibility of contingent claims. As in Schweitzer we found that there were no contingent claims to be discharged because of the absence of a legal relationship.

[I]t was not until the passage of CERCLA that a legal relationship was created between the petitioners and PCC relevant to the petitioners' potential causes of action such that an interest could flow. Because this legal relationship did not evolve until after the Consummation Date, the petitioners did not have contingent claims against PCTC. Accordingly, our decision in Schweitzer leads us to the conclusion that the petitioners' asserted claims under CERCLA did not constitute dischargeable claims within the meaning of section 77 and thus survive the discharge of the debtor.

Id. at 168.

Other Third Circuit cases are consistent with Paoli Yard and Schweitzer. In In re Penn Central Transp. Co., 771 F.2d 762 (3d Cir. 1985) ("Pinney Dock"), the plaintiffs brought antitrust actions against PCC and PCTC for pre-reorganization conspiracies. We examined the nature of the plaintiffs' antitrust claims and found that they existed at the time of the reorganization. Consequently, the claims were presumed discharged by § 77, absent other considerations.8 We expressly distinguished Pinney Dock's

_____

8. We later rejected the plaintiffs' claims of fraudulent concealment and inadequate notice. Id. at 768-72.

19

facts, where all elements of the claim arose before reorganization, from Schweitzer, where one element of the claim, the manifestation of the injury, did not appear until after consummation. Id. at 767.

In our most recent decision on the subject, we applied the same principles. See In re Penn Cent. Transp. Co., 71 F.3d 1113 (3d Cir. 1995) ("Bessemer"), cert. denied, ___ U.S. ___, 116 S.Ct. 1851 (1996). Here, the Bessemer Railroad and USX Corporation sought contribution from PCTC for judgments entered against them in antitrust conspiracies. PCTC raised the shield of its § 77 reorganization, and we applied the Paoli Yard/Schweitzer analysis. We first looked to nonbankruptcy law to determine when the claims accrued. We noted that the plaintiffs sought contribution. Id. at 1115. The event triggering contribution occurred after the date of PCTC's 1978 Consummation Order. As in Schweitzer, the claim did not yet exist at the time of reorganization and thus was not barred. Moreover, as in Schweitzer, the plaintiffs lacked any contingent claim that might have been dismissed because there was no legal relationship between the parties. The joint rate-making agreement signed by the parties did not confer a right of indemnification, so there was no intent to look to PCTC for indemnity or contribution. Absent such an agreement, the necessary legal relationship was lacking. Id. at 1116.

These cases establish the framework for our § 77 discharge analysis. First, we must determine whether the CERCLA claim had accrued at the time of the reorganization. If so, then it was discharged. Pinney Dock, 771 F.2d at 766. To determine whether a claim existed, we look to the substantive area of law governing the underlying claim. See Bessemer, 71 F.3d at 1114. If a claim had not accrued, then we must determine whether the claimant possessed an interest rising to the level of a contingent claim that would be discharged. Schweitzer, 758 F.2d at 942.

Applying these principles to Conrail's contribution claim yields a relatively straightforward answer. Under Paoli Yard, Conrail's § 113 claim was not discharged because SARA had not yet been enacted. In Paoli Yard, we rejected a CERCLA claim against PCTC because "at the moment of the

20

bankruptcy discharge and the inception of the injunction, CERCLA had not yet been passed by Congress. . . . Consequently, at the time of the Consummation Order, there was no statutory basis for liability to be asserted against PCTC by the petitioners." 944 F.2d at 167. This rule applies to the current case. SARA was not passed until 1986. Consequently, at the time of Reading's consummation order, there was no statutory basis for contribution liability.

Reading attempts to avoid this conclusion by arguing that § 113(f) permits a contribution action based on prospective liability. See 42 U.S.C. § 9163(f) ("any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . .. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action . . ..") (emphasis added). Reading also notes that courts, finding an implied right of action under § 107(a)(4)(B), interpreted that section as extending to cases of potential liability. See, e.g., City of Philadelphia v. Stepan Chemical Co., 544 F. Supp. 1135 (E.D. Pa. 1982) (early case finding private right of action).

Adopting either of Reading's arguments would lead to a harsh result. Both would sanction Conrail for failing to allege claims that in December 1980 had no recognized legal form. Section 113's language on potential liability had not been enacted in 1980. Moreover, although we could interpret § 107(a)(4)(B)'s private right of action as emerging fully formed with the passage of CERCLA, the courts did not for several years interpret § 107(a) as containing such a cause of action. If we accepted Reading's position, we would penalize Conrail for failing to register a claim which would not be judicially recognized for two years. See Stepan Chemical, 544 F. Supp. at 1141-43. For these reasons, we will apply Paoli Yard and hold that Conrail's § 113(f) contribution claim did not yet exist at the time of Reading's § 77 reorganization. Thus, it was not discharged.

This ruling on discharge does not, however, end matters. Although Conrail's contribution claim was not discharged by Reading's bankruptcy, the claim nevertheless fails as a matter of law. Conrail's contribution claim depends on

21

Conrail and Reading both being liable to a third party, in this case to the United States. Because, for the reasons we state below, we find that the United States's claim was discharged by Reading's bankruptcy, Conrail's contribution action, based on Reading's common liability with Conrail to the United States, cannot proceed.

As a threshold matter, the United States argues that we need not reach the issue of Reading's liability to the United States. The United States claims that the sole issue raised by this appeal is whether the contribution claim was discharged in bankruptcy. The United States asks that we remand this case so that the derivative nature of the contribution claim and its potential failure can be resolved by the district court. We reject this contention for two reasons. First, as a matter of judicial efficiency, remand would be wasteful. The district court reached both issues, holding that Conrail's § 113(f) contribution is a derivative claim and that the United States' claim was discharged by bankruptcy. Both are matters of statutory interpretation, presenting questions of law subject to plenary review by this court. See Manor Care, 950 F.2d at 124. Rather than remanding to the district court so that it can reexamine the conclusions it has already reached, we will address the issues. Second, although an absence of joint liability may be a defense, when there is no question that joint liability is lacking, a necessary element to establish contribution cannot be proven. The claim for contribution must then, as a matter of law, fail. Consequently, the question of Reading's liability to the United States under § 107 is entirely germane to our current discussion.

We held in Part III.A, supra, that § 113(f) uses the term contribution in its traditional, common law sense. This means that CERCLA contribution, like common law contribution, requires some form of joint liability. See David B. Lilly Co. v. Fisher, 18 F.3d 1112, 1123 (3d Cir. 1994); Green v. United States, 775 F.2d 964, 971 (8th Cir. 1985); Restatement (Second) of Torts § 886A(1) (1977) ("when two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them").

22

CERCLA § 113(f) captures the requirements of joint liability in its statutory language: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f). Conrail suggests, however, that this provision establishes a new form of statutory contribution that spreads liability beyond traditional common law principles. Quoting Sylvester Bros. Dev. Co. v. Burlington N.R. Co., 133 B.R. 648, 653 (D.Minn. 1991),9 Conrail argues that common liability by two or more defendants to one common government agency is not necessary under § 113(f). We disagree. Contribution, by its own definition, requires a common liability for the same injury. For example, the Uniform Contribution Among Tortfeasors Act provides "where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them." Uniform Contribution Among Tortfeasors Act (1955 Revised Act) § 1, 12 U.L.A. 194. We read the language of § 113(f) as adopting the same traditional sense of contribution. In permitting a party to seek contribution from "any other person who is liable or potentially liable" under § 107(a), it is inherent in the concept of contribution that the persons commonly liable be liable to the same entity. Otherwise, contribution could become an endless circle of attempts to seek reimbursement from unrelated parties.

Because § 113(f)(1) reflects the traditional concept of contribution, its language does not permit contribution among liable parties who do not have a common derivation of liability. Section 113(f) parallels the scope of common law contribution, which

_____

9. Conrail's quoted language from Sylvester ("This provision [CERCLA § 113(f)(1)] does not expressly require common liability to a governmental agency, as would be the case under common law contribution." 133 B.R. at 653) is arguably dictum because the court reached this conclusion only after it had already determined that the State of Minnesota's claim against the debtor had not been discharged in bankruptcy and that a common law right to contribution existed.

23

applies to all "joint tortfeasors," in the sense of two or more persons who are liable to the same person for the same harm. It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants.

Restatement (Second) of Torts § 886A, cmt. b. (1977). Applying this traditional meaning of contribution to the current case, we conclude that Reading's liability to Conrail depends on Reading's liability to the United States. To be liable for contribution, Reading must be liable to the United States under § 107(a).

Conrail points out that there are two relevant bases of liability under § 107(a). As provided in § 107(a)(4)(A), a PRP is liable in contribution for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan . . .." Or, under § 107(a)(4)(B), a party is liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

Conrail contends that, because Reading can be liable to Conrail under § 107(a)(4)(B) for costs incurred by Conrail, contribution is not dependent on Reading's liability to the United States under § 107(a)(4)(A). But Conrail is mixing apples and oranges. It is describing a direct action for cleanup costs and arguing that the possibility of such an action demonstrates that common liability is not necessary for contribution. We do not accept this circular argument as valid.

As we have demonstrated in Part III.A., to the extent that Conrail seeks apportionment of the expenses of cleanup, it must do so under § 113(f). Reading's § 113(f) liability for contribution depends on its liability to the United States. Having come to this conclusion, we must then examine the effect of Reading's § 77 reorganization on the United States's claim against Reading. Applying the Schweitzer/ Paoli Yard analysis, we find that all four CERCLA elements making up the United States' claim existed at the time of Reading's § 77 reorganization. The United States' claim against Reading had therefore accrued, and it was discharged by the consummation order.

24

We set out the elements of a § 107(a) CERCLA claim in Part III.A., supra. As to the four elements, there is no dispute that Reading was a "responsible party," that hazardous substances were disposed of at the Douglassville "facility," or that a "release" occurred. The only issue is whether the United States incurred response costs prior to December 31, 1980. It did.

Under the law of this circuit, "if a particular government action qualifies as a `removal action' under the definition contained in CERCLA, the government's costs are recoverable under the unambiguous language of § 107, regardless of what statutory authority was invoked by EPA in connection with its action." United States v. Rohm & Haas, 2 F.3d 1265, 1274-75 and n.15 (3d Cir. 1993) (emphasis added). A removal action involves

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public heal or welfare or to the environment.

42 U.S.C. § 9601(23).

In both 1970 and 1972, federal environmental agencies, acting pursuant to the Clean Water Act, 33 U.S.C. § 1321, undertook cleanups of massive releases from the Douglassville site. These cleanups meet the definition of a "removal action." The United States never recovered its "response costs" for these efforts. Consequently, on the date of Reading's § 77 reorganization, all four CERCLA elements were met. The United States possessed an actual claim against Reading.

The United States has not challenged any of these elements on appeal, choosing instead to advance a novel interpretation of Schweitzer. The United States suggests that Schweitzer always requires a legal relationship between the claimant and the debtor before a claim can be barred.

25

The United States then metamorphoses the legal relationship requirement into a test turning on whether the government had knowledge of the potential claim. This is simply wrong. Schweitzer requires a legal relationship only for the discharge of a contingent claim in bankruptcy. No such relationship is needed for an accrued claim. The United States' CERCLA claim had accrued at the time of the reorganization. The question of a legal relationship is therefore irrelevant. See Paoli Yard, 944 F.2d at 167-68 (discussing legal relationship only for contingent claim); Schweitzer, 758 F.2d at 943 (same); see also In re Remington Rand Corp., 836 F.2d 825, 833 (3d Cir. 1988) (applying Schweitzer; holding government contract claim discharged where claim was contingent and relationship arose from government audit revealing claim).

Moreover, even if we were to accept the United States's argument and assume that some degree of knowledge is a prerequisite for discharge of an accrued claim (and under Schweitzer it is not), we would still hold that the claim was discharged. The question of knowledge is a question of fact, subject to review only for clear error. See Riehl v. Travelers Ins. Co., 772 F.2d 19, 24 (3d Cir. 1985) (describing knowledge of toxic dumping as an issue of fact); see also Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1383 (3d Cir. 1993) (reviewing finding of constructive knowledge of breach of trust for clear error); Brock v. Claridge Hotel & Casino, 846 F.2d 180, 188 (3d Cir. 1988) (reviewing finding of knowledge of legal violation for clear error). The district court made factual findings that the United States had knowledge of its claim prior to the bankruptcy discharge: the United States knew the Douglassville site was an environmental trouble spot and Reading Railroad was connected to it; by October 31, 1980, the EPA had identified the site as potential hazardous waste site; federal officials had twice responded to cleanup needs at the site; EPA knew Reading Railroad had operated a rail line to the site; in 1972 EPA had ordered Reading Railroad to haul waste from the site; and ICC tariffs, available as part of the bankruptcy proceedings, showed that Reading transported hazardous materials to the site. In re Reading Co., 900 F.Supp. at 745-46. In making these findings, the district court also relied on the length of the

26

Reading Railroad's bankruptcy, the government's substantial participation in it, and the large amount of publicity that surrounded CERCLA's passage, along with EPA's advocacy of the statute. Id. The court's finding of knowledge merits deference. With ample support in the record, we cannot say its holding was clearly erroneous. Because of this finding, the United States would lose on the knowledge issue even if we were to conclude that knowledge was necessary.

We hold therefore that under our decisions in Schweitzer and Paoli Yard, the United States' CERCLA claim against Reading for environmental clean-up at the Douglassville site was discharged in the § 77 reorganization. Reading is not liable to the United States under § 107(a)(4)(A), and Reading is therefore not a "person who is liable or potentially liable under [§ 107(a)] of this title," 42 U.S.C. § 9613(f)(1). Conrail's claim for contribution under § 113(f) fails as a matter of law.

At oral argument, Conrail mentioned for the first time that it had spent over $1 million on remedial measures at the Douglassville site. Because of the lateness of Conrail's assertion of any such direct expense, we will not analyze the nature of Conrail's claims to ascertain if Conrail is in fact asserting a claim that is more than one for contribution. See, e.g., United States v. Voigt, 89 F.3d 1050, 1064 n.4 (3d Cir. 1996) (holding that failure to raise an issue until it is brought up at oral argument constitutes a waiver). For that reason, we do not need to consider whether, under the guidelines we have set out in New Castle County v. Halliburton NUS Corp., Conrail can maintain a direct claim under § 107(a)(4)(B) in addition to a claim for contribution.

IV. CONCLUSION

We hold therefore that Reading's § 77 reorganization bars any claim by Conrail for § 113(f) contribution from Reading for the Douglassville site. In reaching this conclusion, we have not elevated bankruptcy law over CERCLA, nor do we perceive a clash between the two systems. Each performs its respective function. Our opinion merely demonstrates

27

that CERCLA claims are treated like any other claim in bankruptcy. Because Reading's liability to the United States for the Douglassville site was discharged in its § 77 reorganization, we will affirm the order of the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

28